# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JOSEPH ALEXANDER,**<br>800 Kenilworth Ave NE<br>Washington, DC 20019<br><br>Plaintiff,<br><br>   v.<br><br>**GOVERNMENT OF THE DISTRICT OF COLUMBIA**<br><br>**SERVE:** Mayor Muriel Bower<br>Designee:  Darlene Fields<br>441 4th street NW<br>Suite 600 South<br>Washington, D.C. 20001<br>202-724-6507<br><br><br>**SERVE:** Karl Racine, Attorney General<br>Designee: Darlene Fields or Tonia Robinson<br>or Gale Rivers<br>Attorney General for the District of Columbia<br>441 4th Street, N.W., 6th Floor South<br>Washington, D.C. 20001<br>202-724-6295<br><br>and<br><br>**FREDERICK ONOJA**<br>1805 Bladensburg Road, NE<br>Washington, DC 20002<br><br>Defendants. | Civil Action No: |

# CLASS ACTION COMPLAINT

# COMPLAINT FOR MONEY DAMAGES AND JURY DEMAND

1.      Joseph Alexander on behalf of himself and the Arrest Class and the Prosecution Class
(both defined below) brings this action against the Government of the District of Columbia (the
"District" or the "District of Columbia') for injuries he and the other members of the classes
suffered during the Class Period because the D.C. Council enacted an "incommoding" or
"blocking passage" statute which is so vague that it encourages arbitrary and discriminatory
enforcement, and it fails to give ordinary people fair notice of the conduct it punishes fails to
define the criminal offense with sufficient definiteness that ordinary people can understand what
conduct is prohibited so  they cannot know what they must do to conform their conduct to the
statute. D.C. Code § 22-1307 (revised[1] in 2011).

2.      Moreover, the District through its MPD (defined below) enforces the statute in an arbitrary
and discriminatory manner because the MPD enforces the "incommoding" statute almost
exclusively against African Americans, especially in predominantly or traditionally African
American areas of the City. The statute delegates to the officer on the beat unfettered discretion to
define "crowding, obstructing, or incommoding." MPD officers approach African Americans who
are standing still on the sidewalk in order to warn or cite them for blocking passage, regardless of
the number of persons and regardless of whether they are presenting an obstacle to pedestrian
traffic, "only at the whim of any police officer."

3.      The District has allowed its officers to expand the "stop blocking" element of the law which
makes it a criminal offense "to continue or resume the crowding, obstructing, or incommoding
after being instructed by a law enforcement officer to cease the crowding, obstructing, or

_____

[1] The provision was enacted in its current form in 2011. D.C. Act 18-693, § 302 (a), 58 D.C.
Reg. 640, 644 (2011) (emergency legislation); D.C. Act 19-45, § 302 (a), 58 D.C. Reg. 3701,
3705 (2011) (second emergency legislation); D.C. Act 18-699, § 2 (a), 58 D.C. Reg. 731 (2011)
(permanent legislation).

incommoding" into a "move on" provision which authorizes the MPD to, in their unlimited

discretion, to banish someone from an area. The OAG has endorsed the MPD's expansion of the

"top blocking" provision. As enforced by the MPD with the approval of the Attorney General, the

statute reads: "it is unlawful for any person to stand or loiter upon any sidewalk of the city after

having been requested by any police officer to move on."

4.      The Attorney General of the District of Columbia (the "OAG") (directly and through the

US Attorney acting with the consent of the OAG pursuant to D.C. Code § 23-101(d) and (e))

prosecutes mainly African Americans except in the protestor context.[2]

5.      As a result of the vagueness of D.C. Code § 22-1307, alone or in combination with the lack

of MPD training and supervision, and the failure of the D.C. Council to clarify the law, this

provision has come to be used as an unconstitutional anti-loitering statute and one of the preferred

statutes for law enforcement officers to use in lieu of the disorderly conduct statute as the favored

"contempt of cop" charge.

6.      The class period in this case runs from three years from the date of filing of the original

complaint in <u>Agnew, et al, v. Government of the District of Columbia</u>, 15-349 (**ABJ**), which was

filed on 3/09/15. That case (dismissed on 6/26/17; appeal noted) employed the same class

definitions in this case and so it tolled the statute of limitations for class members in both cases.

---

[2] The penalty for a violation of D.C. Code § 22-1307 is a fine of $500 or 90 days in jail. The Office of the Attorney General of the District of Columbia ("OAG") is the proper authority to prosecute alleged violations of the incommoding statute. D.C. Code § 23-101(b). However, the US Attorney may also prosecute cases under the incommoding statute if the Attorney General of the District of Columbia consents. D.C. Code § 23-101(d) and (e).

## Jurisdiction and Venue

**7.**     This Court has original jurisdiction over plaintiffs' § 1983 claims pursuant to 28 U.S.C. §

1331 and 28 U.S.C. § 1343(a)(3).

**8.**     Venue is appropriate in this District. Each of the claims for relief arose in this judicial

district and all events described herein occurred in the District of Columbia.

## Parties

**9.**     Mr. Alexander is an adult.

**10.**     Mr. Alexander is a young African American man.

**11.**     Officer Onoja is a member of the District of Columbia Metropolitan Police Department

(sometimes "MPD"). He is not named as a party but he played a prominent role in Mr.

Alexander's arrest and the arrest of others for crowding, obstructing, or incommoding under D.C.

Code § 22-1307 during the Class Period.

**12.**     The District is a municipal corporation capable of being sued under D.C. Code § 1-102.

**13.**     During all events described herein, all police officers referred to herein, named or

unnamed, unless otherwise specified, were police officers of the District of Columbia Metropolitan

Police Department acting within the scope of that employment, in furtherance of the interests of

the District of Columbia, and under color of the statutes, ordinances, rules, customs, and usage of

the District of Columbia.

## Sidewalk Use

14.    People use sidewalks as a gathering place where they can socialize, shop, and enjoy the theatre of life, and not just as paths like the people-movers that connect terminals in airports. As Aristotle says, "People are by nature urban creatures." Politics Book I (1253a1-18).



15.    Figure 1, people lined up along 33d Street, NW in Georgetown waiting to buy cupcakes at Georgetown Cupcake.

16.    They stop, shake hands, and chat, and, invariably, as part of human nature when they stop and chat they stop in the middle of the sidewalk.

17.    Elderly people use walkers on the sidewalk.



18.

**19.**   Figure 2, elderly resident uses walker on sidewalk in Southeast.

**20.**   They push large baby carriages up narrow, tree-lined, leaf covered sidewalks and they stop and visit with neighbors standing there or passing by.



**21.**

**22.**   Figure 3, young mom pushing a large baby buggy on a narrow sidewalk unwittingly "crowds, obstructs, and incommodes" a sidewalk in the District of Columbia.

**23.**   They queue up on the sidewalk to catch the Metrobus and get into the theatre.

**24.**   They sit on the steps of the Smithsonian to enjoy the weather. They sit outside at outdoor cafes.



Posted by SimplyNess on Aug 20, 2012 in Street Scenes | 0 comments

Buy Print   |   Buy Card   |   Download   |                                                    eCard

Copyright protected by Digiprove © 2012 Ness Flores
Some Rights Reserved

25.     They stand in groups on the sidewalk after services and talk after leaving their churches, temples, and mosques, and other places of worship.

26.     They completely clog the sidewalks after sporting events and concerts at venues like the Verizon Center.

27.     And young guys have always liked to hang on the corners.



28.                              People do it all over the world.



29.     They hang out on the streets and corners, especially in the poorer neighborhoods, where there are no theatres, museums, or outdoor cafes, and the government has not sponsored redevelopment zones.

30.     In other words, life happens on the sidewalks of the District of Columbia all the time.

31.     The incommoding statute, because of the extremely broad scope of innocent behavior it covers, authorizes arrest in each one of these situations - in the police officer's discretion.

32.     But, unless they are African American or homeless, MPD officers do not arrest them.

33.     No one has ever been arrested for crowding, obstructing, or incommoding in Georgetown while waiting to buy cupcakes at Georgetown Cupcake

**Details of Named Plaintiff Joseph Alexander's Arrest on Bladensburg Road, NE, and his Release on Citation**

34.     Like other Washingtonians, Mr. Alexander likes to be outside with other people when the weather is fine.

35.     On Saturday August 8, 2015, about 5:30 pm, it was partly sunny and 86 degrees.

36.     Like people all across the City, Mr. Alexander was outside enjoying the fine weather and the company of friends and neighbors.

37.     Mr. Alexander was standing in the alley where it touches Benning Road, N.E. next to the "Stanton" store, Figure 5, at 1044 Bladensburg Road, NE in Washington, DC, a popular neighborhood convenience store where people gather and buy snacks and drinks.



38.     The entire episode was captured on "video" (or some type of electronic imaging) because the store has cameras in the alley which runs alongside the store which capture the alley, and cameras in front of the store which capture the sidewalk in front of the store.

39.     The sidewalk in front of the store is easily wide enough for people to chat with each other on the sidewalk and still allow other people to walk or bicycle up or down the sidewalk.

40.    At that time there was even a public pay phone in front of the store and plenty of room for people to use it.

41.    For example, people, including Officer Onoja, ride their bikes on the sidewalk in front of the store, and every few minutes someone rides a bicycle up or down the sidewalk past the store.



42.

43.

44.    People also walk up and down the street with their dogs.





**45.**

**46.**    Mr. Alexander was standing at the intersection of the alley and the sidewalk in the alley when Officer Onoja arrived, having arrived by walking through the alley alongside of the store about a minute before Officer Onoja arrived.



**47.**

Mr. Alexander is walking ahead of the man in the striped shirt.

**48.**    Mr. Alexander was not blocking passage nor was he presenting an obstacle to pedestrian

traffic. Pedestrians, even a pedestrian with two dogs on a leash, were able to saunter past, as the

picture shows (Mr. Alexander is out of the frame in the alley behind the young man in the white

tee shirt). See picture above with woman walking two dogs.

49.     Officer Onoja told Mr. Alexander (Mr. Alexander is in the tee shirt with white and black sneakers) to leave the area when Officer Onoja rode up and saw Mr. Alexander standing there.



50.     Mr. Alexander did leave the area but over the next five minutes Mr. Alexander walked up and down the sidewalk a few times.

51.      Officer Onoja radioed for back up and three officers arrived and stood in the sidewalk

near the alley for a minute before Mr. Alexander came back down the street.



52.      As Mr. Alexander walked down the sidewalk and as he passed the alley Officer Onoja let

him pass and then grabbed him from behind.



53.

54.     Several officers then converged on Mr. Alexander and they hand cuffed him and arrested him.



**Mr. Alexander at the Station, released on citation; case no-papered**

55.     After Mr. Alexander was arrested MPD officers transported him to the 5th District station.

56.     He was approved for citation release and he was released on citation.

57.     The OAG "no-papered" his case.

**Mr. Alexander' arrest illustrates how the incommoding statute is unconstitutional vague and how the MPD enforce it mainly against African Americans in arbitrary and discriminatory manner**

58.     Mr. Alexander' arrest and prosecution pursuant to the incommoding statute illustrates how the statute is unconstitutional vague and how the MPD enforce it mainly against African Americans in arbitrary and discriminatory manner.

**59.**     First, he is African American.

**60.**     Next, he was not "crowding, obstructing, or incommoding" anyone's passage on the sidewalk. Rather, he was using the sidewalk as intended.

**61.**     He was in an alley off the sidewalk against the wall.

**62.**     He had no intention to block – fully or even partially - anyone else's use of the sidewalk.

**63.**     Nor did he.

**64.**     His arrest illustrates that the MPD apply the statute even to someone standing alone or with one or two or a few other people on the sidewalk even when there is plenty of room on the sidewalk for other people to get by or walk around on the sidewalk.

**65.**     Instead of simply instructing Mr. Alexander to "cease the crowding, obstructing, or incommoding" as the statute provides Officer Onoja instead issued a "dispersal order" or "move on order" and ordered Mr. Alexander to leave the area.

**66.**     The practice of Officer Onoja in this case and the practice of other MPD officers is to treat the "cease the crowding, obstructing, or incommoding" prong as authority to issue "move on" or "dispersal" orders and the practice of the MPD is the order persons to leave the area, not just ""cease the crowding, obstructing, or incommoding."

**67.**     The OAG takes the position that the "cease the crowding, obstructing, or incommoding" prong authorizes an officer to order a person to leave the area. The OAG contends that the operative element of the offense is "a person must have disregarded a law enforcement officer's instruction to move."

68.     Next, at the point he was arrested he was by himself and he was not engaging in conduct which interfered with other pedestrians' free passage on the sidewalk. He had left the area and he was walking back down Bladensburg Road.

69.     In fact, as he came walking down the street three MPD officers were standing right in the middle of the sidewalk and he was able to walk past them.

70.     The statute did not give him reasonable notice that his conduct was in violation of the statute. The statute informs people to "cease crowding, obstructing, or incommoding" when instructed to do so by a law enforcement officer and that is exactly what he did.

### The text of the incommoding statute as amended in 2011

71.     The D.C. Council made revisions to the incommoding statute in 2010 which became effective in 2011.

72.     The previous version of § 22-1307 provided,

> It shall not be lawful for any person or persons within the District of Columbia to congregate and assemble in any street . . . or any park or reservation . . . and engage in loud and boisterous talking or other disorderly conduct, or to insult or make rude or obscene gestures or comments or observations on persons passing by, or in their hearing, or to crowd, obstruct, or incommode the free use of such street . . . .

73.     The District of Columbia Circuit Court of Appeals had glossed a breach of the peace *mens rea* requirement into the previous version of the statute in 1969 to prevent punishment of persons who innocently obstructed use of a sidewalk by congregating on it. <u>Adams v. United States</u>, 256 A.2d 563, 564-565 (D.C. 1969).

**74.**     The D.C. Council made five major changes to the statute which rendered it

unconstitutionally vague under the second prong of the vagueness doctrine: (1) the Council

eliminated any *scienter* element by consciously deciding not to include the "breach of peace"

*scienter* element which the Court of Appeals had added by gloss to the previous version of the

statute to make the statute Constitutional or any other *scienter* element; (2) the Council eliminated

the "assembly" element of the statute by reducing the number of people required for a violation

from three to one, thereby greatly expanding the type of innocent conduct subject to the statute

and also thereby eliminating any common law *mens rea* requirement imported into the statute

from the common law offense of unlawful assembly; (3) the Council retained the terms "crowd,"

"obstruct," and "incommode" without providing any definitions or limiting criteria in the

incommoding statute; (4) the Council refused to replace these vague and archaic terms with a

clearly understood term such as "block passage;" and (5) the Council substituted a "dispersal

order" or "move on order" for the *mens rea* requirement (while rejecting any narrowing

qualifications such as duration qualifications on the dispersal order).

**75.**     In pertinent part, the "incommoding" statute as amended in 2011 reads:

> It is unlawful, alone or in concert with others, to [A] crowd, obstruct, or
> incommode [1] the use of any street, avenue, alley, road, highway, or sidewalk, or
> [2] the entrance of any public or private building or enclosure or [3] the use of or
> passage through any public conveyance, and [B] to continue or resume the
> crowding, obstructing, or incommoding after being instructed by a law enforcement
> officer to cease the crowding, obstructing, or incommoding.

D.C. Code § 22-1307(a) (D.C. 2014).

76.     As enacted the statute can be enforced against a single person acting alone even when that person's conduct did not interfere with other pedestrians' free passage on the sidewalk, and even when no one else is on the sidewalk.

77.     The MPD frequently arrests or orders to "move on" a single person on the sidewalk even when no one else is around. Arrests of Mr. Bey, Mr. Agnew, Mr. Dennis, and Ms. Williamspn, all described below.

78.     In fact, on occasion the MPD arrests people or orders them to leave for crowding, obstructing, or incommoding even when they are not even on the sidewalk but next to it. Arrest of Mr. Bey, described below.

79.     And the statute does not have any appropriate *mens rea* requirement.

**The Council Received Warnings Before and After Enacting the Revised Incommoding Statute That Could Be and In Fact Was Being Used As A Loitering Statute but the Council Enacted the Statute Anyway and The Counsel has Taken No Steps to Correct It**

**The D.C. Council enacted the unconstitutional incommoding statute in its current form despite being advised not to by the Council for Court Excellence, the ACLU, the US Attorney, and the MPD, and the Washington Legal Clinic for the Homeless**

80.     The incommoding statute is one of the many "quality of life" statutes that Officer Onoja and other officers of the MPD use and have used to clear the streets of persons they consider undesirables.

81.     In 2010, the Council for Court Excellence (CCE) (acting with the ACLU, the US Attorney, the OAG, the MPD, and other concerned groups, issued a report entitled, "Revising the District of

Columbia Disorderly Conduct Statutes: A Report and Proposed Legislation." The report recognized that the then-existing statutes "may give too much discretion to police to determine what conduct is disorderly."

82.     At that time "incommoding" was part of the disorderly conduct statute. D.C. Code § 22-1307.

83.     The CCE report contained proposed legislation that prohibited "blocking" but not "incommoding," "obstructing" or "crowding" because the CCE report concluded that the then-existing law's prohibition on "crowding" was deemed to be too vague, and because the CCE recognized the dangers in drafting the statute so broadly that it could be used as an anti-loitering statute.

84.     But, the D.C. Office of the Attorney General, MPD, and the U.S. Attorney's Office dissented from the CCE proposed legislation, in part, because they believed that 'blocking' was likely to be construed more narrowly than 'crowding, obstructing, or incommoding."

85.     However, the dissenters still recognized the danger that a law prohibiting crowding, obstructing, or incommoding the free use of sidewalks and entrances could be used as a subterfuge for an unconstitutional loitering law.

86.     So, the MPD and OAG and the United States Attorney's Office proposed language for "blocking" sidewalks which included a *mens rea* element **and** a "stop blocking" order.

87.     The ACLU also warned the Council that the proposed language for "blocking" sidewalks should include a *mens rea* element as well as a "stop blocking" order.

88.     The Model Penal Code version of an "obstructing the sidewalk" statute has a "purposely or recklessly" *mens rea* requirement, but a person commits a misdemeanor only if they "persist" after

a law enforcement officer's warning. Model Penal Code § 250.7. The Model Penal Code does not have a "move on" element except for "gatherings." *Id.* § 250.7.

89.     The D.C. Council subsequently took up consideration of the "Disorderly Conduct Amendment Act of 2010," Bill 18-425.

90.     The Council received written testimony about this bill from Ann Marie Staudenmaier, a staff attorney at the Washington Legal Clinic for the Homeless, who testified that police told "many" individuals to "move along" rather than to "stop blocking" in situations which could not possibly be interpreted as incommoding.

91.     Despite the concerns raised by the CCE report and the Washington Legal Clinic for the Homeless, and the suggestions of the MPD and OAG and the United States Attorney's Office, the Council enacted D.C. Code § 22-1307 with language that prohibits "crowd[ing], obstruct[ing], or incommod[ing]" and made the statute applicable to one person's conduct instead of three persons as the previous version had.

92.     Also, the Council disregarded the advice of OAG, MPD, and the United States Attorney's Office and ACLU and deleted any "*scienter*" element such as requiring that the conduct prohibited by the statute be committed "intentionally" or "recklessly."

93.     The District thus was on notice, as a result of the CCE report and testimony from the Washington Legal Clinic for the Homeless, and their proposals and (the MPD and OAG's) and the United States Attorney's Office's, and the ACLU's and the history of unfounded arrests for offenses such as disorderly conduct and POCA that the statute had the potential to be abused, and that its administration should be carefully monitored and officers needed training and constant reinforcement training.

**Problems with the statute became apparent to the District shortly after it became effective and put the District on notice that the statute is vague and that it encourages arbitrary and discriminatory enforcement**

94.     Shortly after the amendments became effective the D.C. Council learned that the incommoding statute was being enforced in an arbitrary and discriminatory manner.

95.     It was being used as a loitering statute because it was being used against a single person acting alone even when that person's conduct did not interfere with other pedestrians' free passage on the sidewalk.

96.     The D.C. Council held hearings to investigate the problem.

97.     Moreover, in a letter to then-Attorney General Irv Nathan, Council Member Mary Cheh informed the Council that that the MPD were enforcing the incommoding statute in an arbitrary and discriminatory manner.

98.     Council Member Mary Cheh recognized that the dispersal / move-on element meant giving police the right to banish anyone from a public space whenever they wanted.

99.     But, the D.C. Council did not take any steps to amend the statute to fix the problem of arbitrary and discriminatory enforcement caused by the vagueness described herein.

**Witnesses told the Council in hearings that the newly amended statute was being enforced against a single person who was not blocking passage on the sidewalks but the Council decided not to amend the language of the statute**

100.    For example, in 2011, Bill Hassay, Jr., a solo musician performing at the corner of Wisconsin and M St., NW, was threatened by an MPD police officer with arrest for blocking a sidewalk. The officer told Mr. Hassay that "pedestrians need the full width" of the sidewalk.

101.    Following the incident involving Hassay, the ACLU pointed out to high-ranking officials at MPD Headquarters and Second District that the officer had misinterpreted the law.

102.    The incident involving Hassay and the communication from the ACLU put the District on notice that without proper training and supervision, officers could and would apply the statute in a way that violated citizens' rights.

103.    On February 1, 2012, the D.C. Council, Committee on the Judiciary, held a hearing regarding the 2011 revisions to the disorderly conduct statute and heard testimony from the ACLU on the Hassay incident.

104.    ACLU testimony again put the District on notice that without proper training and supervision, officers could and would apply the statute in a way that violated citizens' rights. By referring to the problems reported from homeless advocates, Mr. Mulhauser put the District on notice that the incident involving Hassay was not an isolated or one-time problem.

105.    Kelly O'Meara, Director of the Office of Strategic Change, MPD also testified at the February 1, 2012 hearing. Ms. O'Meara testified that after the enactment of the changes to the District's disorderly conduct law, MPD developed a written directive explaining the law and an online training session that could be delivered to all members of the MPD. All members were required to certify that they had reviewed the directive and taken and passed the online training.

106.    However, neither the written directive nor the online training session addressed the issue of whether partial blocking was sufficient to justify an arrest, nor covered using the incommoding statute as a way for the MPD to control the streets without supervision of prosecutors or the courts.

107.    Councilmember Mendelson explained to the MPD that disorderly conduct offenses can be easily misunderstood and suggested that training may be as important, or more important, than the clarity that the Council thought it brought to the law. He pointed out that an intensive refresher training may be needed, not doing it once. Councilmember Mendelson asked Ms. O'Meara to get back to him on what MPD will do on intensive refresher training and how often.

108.    When asked by Councilmember Mendelson about ACLU's proposed amendment to the disorderly conduct statute, Ms. O'Meara noted that the issue was discussed at length by the Council for Court Excellence and that the term "incommoding" was added to ensure the statute reached more than "full blocking," such as situations where an individual was controlling the entire space.

### Police Complaints Board Releases Report on MPD's Enforcement of Blocking Passage Law

109.    More recently, on May 22, 2017, the District of Columbia's Police Complaints Board (PCB), the governing body of the Office of Police Complaints (OPC), issued a report to Mayor Muriel Bowser, the Council of the District of Columbia and Metropolitan Police Department (MPD) Chief Peter Newsham regarding concerns about MPD's enforcement of the "Blocking Passage" law.

110.    Since passage of the law, OPC has received 14 complaints alleging officers have improperly issued individuals "move along" orders for blocking passage or citations. Several of these

complaints have led to sustained allegations against MPD officers. There are also complaints currently under investigation with OPC that involve blocking passage allegations.

111.    In addition, OPC noticed that a majority of the individuals who filed a complaint with the agency belong to a specific racial group (African Americans) and some identified as homeless.

112.    The PCB is concerned that MPD officers use of the Blocking Passage statute is disproportionally discriminating against these specific groups of people.

113.    One example happened when the complainant left the Congress Heights metro station and walked towards her car where she met up with her children. The complainant and her children were standing on the sidewalk on 13th Street, S.E., near Alabama Avenue, when the subject officer yelled at them to "Get off the sidewalk!" twice, and then said, "I'm going to leave and come back, if you're still over there, it'll be a problem." The subject officer then left, returned, and continued yelling, "I said, get off the sidewalk!" As the complainant and her children walked away, the subject officer followed them, "yelling" at them as they walked down the street.

114.    The OPC conducted a complete investigation of the complaint, and issued a Report of Investigation (ROI) finding that the officer improperly harassed the complainant when he repeatedly instructed the complainant and her children to "[g]et off the sidewalk" and then followed them down the street, among other allegations in the original complaint.

115.    This finding was partially based on statements from the subject and witness officer, who said that in general, they approach people who are standing still on the sidewalk in order to warn or cite them for blocking passage, regardless of the number of persons and regardless of whether they are presenting an obstacle to pedestrian traffic. The subject officer also stated that he had made "numerous" arrests for blocking passage. The allegation of harassment was sustained in a

merits determination by a Complaint Examiner, finding that there was no evidence that the complainant had actually been blocking passage, when in fact she was merely standing on the sidewalk talking to her children.

116.    In another case, an MPD Officer observed two complainants on the sidewalk in front of the home where they resided. One complainant was holding onto the fence that surrounded his home, and the other complainant was leaning against his car parked on the street in front of his home. The subject officer used the loudspeaker of his MPD vehicle to tell the complainants to leave the premises. The complainants separately shouted back that they lived there. The subject officer then exited his vehicle and told the complainants to move along and that they were blocking passage. The complainants refused, and the subject officer issued them both separate 61D citations. When the complainant asked why they were receiving citations the subject officer said "I can do what I want and write what I want on the ticket."

117.    The OPC also conducted a complete investigation of this complaint, and issued a ROI finding that the officer improperly harassed the complainants when he ordered them to "move along" and by unlawfully issuing 61D citations for "blocking passage."

**The MPD and the Prosecutors Have Enforced the Statute as a General Loitering Statute and the District Knew or Should Have Known of the Practice and the District Acquiesced in the Practice**

**The Incommoding Statute is employed especially against African Americans in neighborhoods such as the Trinidad area and the H Street – Bladensburg Road area**

118.    The incommoding statute is employed especially against young African American men in the community most frequently in and near areas such as the Trinidad area, "Where the Sidewalk

Ends," Will Sommer, City Paper, May 21, 2015, and the areas around Bladensburg Road and H Street where gentrification is pushing out the traditional residents.

http://www.washingtoncitypaper.com/articles/47171/where-the-sidewalk-ends-dcs-law-against-blocking-the-sidewalk

119.    These areas are in the process of gentrification and both the area and the streets there are being cleared of the traditionally African American residents.

## One detective in Detective the 5th District explains the MPD's philosophy of quality of life policing

120.    On January 13, 2016 about 8:00 pm Mr. Junes, a long-time resident of the Bladensburg Road area, was riding his bicycle through the alley behind Roses Liquor at 830 Bladensburg Road, NE, Washington, DC. when he stopped to fix his gloves and his bike.

121.    Officer Onoja sprayed pepper spray in Mr. Junes' face and arrested him for POCA under D.C. Code § 25-1001(a) (possession of an open container of alcohol) and Mr. Junes was transported to the station.

122.    After arriving at the station Mr. Junes was taken into an interview room where a Detective explained the MPD's current philosophy of quality of life policing to Mr. Junes during a video-taped re-education session.

123.    The Detective explained to Mr. Junes that the neighborhood around Starburst Plaza (at the intersection of H street and Bladensburg Road, NE) and the "Bladensburg Road corridor" is changing with homes now worth up to $600,000.

124.    The Detective explained to Mr. Junes that 5th District officers believe that undesirables congregate at Starburst Plaza so the police heavily patrol the area.

125.    So the police now take a zero tolerance approach to quality of life crimes because they depress property values.

126.    The detective explained that when the police went to Starburst Plaza they did not discriminate between the bad and the good people and the police just make the long-time residents leave or disperse or arrest them them because congregating is bad for the community.

127.    The Detective told Mr. Junes that the neighborhood is changing and people have to act in a more civilized way.

128.    The Detective told Mr. Junes that the City has big plans for the neighborhood.

### Arrest of Young African American Man in Starburst Intersection Plaza

129.    The Starburst Intersection Plaza is a broad plaza with broad walkways and the District installed benches and chess tables and chairs and other furniture which invite people to sit and spend time in the park.



Top: Current engineering sketches for the Starburst intersection. Bottom: Plaza concept sketch from the H Street-Benning Road Great Streets project. Click to enlarge.

130.    Figure 4 is Starburst Plaza is at the intersection of H Street, NE and Bladensburg Road, NE Washington, DC 20002.

131.    It is administered by the District of Columbia Department of Transportation so there is no curfew.

132.    On about 9/4/2014 several African American men were in the Starburst Intersection Plaza at 1550 Maryland Ave NE, Washington, DC 20002 during normal park hours at night using it as the District intended by sitting down and chatting.

133.    Many other people were enjoying the park as invited, some sitting down and others walking.

134.    There is a late-night bus stop at one end of the park which serves several bus lines.

135.    The young men were sitting at the edge of a broad walkway. They were not blocking the passage of anyone.

136.    Suddenly several carloads of MPD officers stormed into the park like an occupying army and ordered everyone to leave even though by law the park was open.

137.    The police were successful in clearing the park of people they deemed undesirables – almost.

138.    All but one of the young men left.

139.    That one young man protested and exercised his First Amendment rights to complain to a police officer about his treatment.

140.    The MPD arrested him for incommoding.

141.    The OAG prosecuted him for incommoding in a bench trial but he was acquitted by the Court on a defense motion for judgment of acquittal.

### Mr. Bugg Bey's Arrest by Officer Onoja

**142.**     On about Friday, May 9, 2014 between 3 and 5 pm Mr. Bugg Bey was leaning against a fence in front of 1607 Levis Street, NE, with the permission of the owner in the Trinidad area chatting with about eight other friends and neighbors.

**143.**     The fence was on a strip of private property between the sidewalk and the fence in the yard of the house.

**144.**     Officer Onoja, the arresting officer, knew before he arrested Mr. Bugg Bey that that strip of grass in the yard between the sidewalk and the fence is private property.

**145.**     None of the group was standing in the sidewalk.

**146.**     None of the group was blocking passage along the sidewalk and no pedestrians were trying to walk along the sidewalk at this time.

**147.**     But, had any pedestrians happened along, Mr. Bugg Bey and his friends would have gladly made way for them to pass if needed.

**148.**     According to Mr. Bugg Bey, Officer Onoja "pretty much – he told us that we had to leave from where we was at. That we had to move."

**149.**     The group did leave.

**150.**     About an hour later Officer Onoja and Officer Slopac returned and saw Mr. Bugg Bey and two or three members of the group again chatting in basically the same place.

**151.**     Officer Onoja immediately arrested Mr. Bugg Bey for "blocking passage" under D.C. Code § 22-1307 as soon as he saw him.

**152.**     Mr. Bugg Bey was transported to the 5th District station and to Central Cellblock where he was held overnight.

153.    The next morning Mr. Bugg Bey was presented in Superior Court but he was released because his case was "no-papered."

## Mr. Agnew's Arrest on Christmas Eve

154.    Mr. Agnew was arrested on Christmas Eve when he and the mother of his child and a friend were enjoying the evening air on the stoop of his child's mother's building at 3146 Buena Vista Terrace, SE in Washington, DC.



155.

156.    But, the way was clear for pedestrians to come and go around them and many people were in fact coming and going around them because it was Christmas Eve.

157.    Suddenly the pleasant scene was shattered when Officer Vincent Norris rolled up in his police cruiser and in a furious manner yelled at Mr. Agnew and the others to leave.

158.    Officer Norris is known to have arrested several other young African American men in the area for incommoding.

159.    Mr. Agnew explained that they were simply taking the air and smoking outside because his daughter had asthma and he did not smoke around her.

160.    He explained that the mother lived there and they had every right to be there.

161.    Enraged, Officer Norris screamed at Mr. Agnew and the others to leave because, as he said, they were "blocking passage."

162.    The police report in Mr. Agnew's case which Officer Norris' partner authored has the same operative language as the <u>Gerstein</u> in Mr. Dennis's case (below) which Officer Norris also authored, namely, "Both of the males were standing in a manner that would cause a citizen or citizens trying to utilize the walkway to deviate from their path of walking."

163.    Officer Norris' partner then arrested Mr. Agnew for incommoding.

164.    Mr. Agnew spent the night and jail and after a few court appearances the government dismissed his case.

### Mr. Dennis' Arrest on Thanksgiving Eve

165.    Mr. Dennis was arrested on Thanksgiving Eve, 11/26/2014, when and his family were preparing their Thanksgiving celebration on Thanksgiving Eve, at their home at 3130 Buena Vista Terrace, SE in Washington, DC.

166.    Mr. Dennis had stepped outside for a moment and he was standing in the yard on a ramp a few feet in front of the porch to his apartment building getting a breath of evening air, taking a break from the cooking.



167.

168.    The way on the ramp was clear for pedestrians to come and go.

169.    No one was trying to come up the ramp.

170.    If someone had come by, Mr. Dennis would have moved.

171.    The police report does not mention anyone who could not get past him.

172.    That holiday spirit vanished when Officer Vincent Norris rolled up in his police cruiser and in a furious manner yelled at Mr. Dennis and another man to leave.

173.    Mr. Dennis refused to move because, as he explained, he was simply standing in front of his home.

174.     The ramp is wide enough to allow two or three people to walk on it.

175.      "How can you tell me to move from the place where I live at?" Mr. Dennis asked Officer Norris.

176.     Because the statute vests unlimited discretion in law enforcement officers to determine whether a person on the sidewalk or in a doorway is "crowding, obstructing, or incommoding" and Officer Norris exercised his discretion to classify Mr. Dennis as "crowding, obstructing, or incommoding".

177.     When Mr. Dennis refused to move, Officer Norris arrested him and put him into a van.

178.     The Gerstein in Mr. Dennis's case authored by Officer Norris has the same operative language as the police report in Mr. Agnew's case which Officer Norris' partner authored, namely, "Both of the males were standing in a manner that would cause a citizen or citizens trying to utilize the walkway to deviate from their path of walking."

179.     Mr. Dennis spent the night and jail and after a few court appearances the government dismissed his case.

### Ms. Williamson's Arrest

180.     Ms. Williamson's contact with MPD began about 3:50 pm on 2/4/2015 on a commercial street at 2403 Martin Luther King, Jr. Ave., S.E.

181.     Officer Richardo Amos told Ms. Williamson to move from where she was standing on the sidewalk at 2403 Martin Luther King, Jr. Ave., S.E. because, as his police report reads, he observed her standing in front of the location "disrupting the smooth flow of pedestrian traffic."

182.     Figure 4 shows the commercial location where Ms. Williamson was arrested.



183.     Officer Amos' report does not state that he observed any people at all who were present at the location when he observed Ms. Williamson.

184.     Ms. Williamson was standing on the sidewalk and walking on the sidewalk when she was observed by Officer Amos.

185.     The way was clear for pedestrians to come and go.

186.     No one was trying to walk on the sidewalk where Ms. Williamson was.

187.     She was not blocking the passage or even obstructing it.

188.     If someone had come by, Ms. Williamson would have moved as needed.

189.     The police report does not mention anyone who could not get past her during his initial encounter with her.

190.     Officer Amos ordered Ms. Williamson to leave about 3:30 pm.

191.     Ms. Williamson continued walking and standing in the area but always allowing other people enjoying the area with her to have free passage on the sidewalk.

192.    Officer Amos came back about half an hour later arrested Ms. Williamson because, as his report states, "he observed pedestrians having to maneuver around her to get by on the sidewalk, and because merchants were complaining about her in the area."

193.    Ms. Williamson tried explained to Officer Amos why she was doing nothing wrong and did not have to leave.

194.    Because the statute vests unlimited discretion in law enforcement officers to determine whether a person on the sidewalk or in a doorway is "crowding, obstructing, or incommoding" and Officer Amos exercised his discretion to classify Ms. Williamson as "crowding, obstructing, or incommoding" the statute applied to Ms. Williamson.

195.    Officer Amos arrested her for crowding, obstructing, or incommoding. Ms. Williamson spent the night and jail and after a few court appearances the government dismissed his case.

### Defendant Onoja is an open and notorious violator of civil rights.

196.    Defendant Onoja is an open and notorious violator of civil rights of the people in the District of Columbia whom he polices.

197.    His arrest of Mr. Alexander in this case, and Mr. Bey, are typical of the arrests that he makes and made for crowding, obstructing, or incommoding and other MPD officers make and made for crowding, obstructing, or incommoding.

198.    Officer Onoja has arrested several other young African American men and juveniles in the area.

199.    On numerous occasions defendant Onoja has arrested and pressed trumped up charges against young African American men and other people without probable cause.

200.    On numerous occasions defendant Onoja has harassed and even arrested people, especially young African American men, without probable cause for alleged violations of the District's incommoding statute. D.C. Code § 22-1307(a).

201.    The incommoding statute purports to criminalize conduct when it results in "crowding, obstructing, or incommoding" the sidewalk or entrances to public or private buildings, and the person refuses to move on when so ordered. D.C. Code § 22-1307(a).

202.    Defendant Onoja used the statute to clear the sidewalks in his patrol area of young African American men who have done nothing wrong.

203.    Officer Onoja makes most of his arrests on the ¼ mile strip of Bladensburg Rd NE, Washington, DC 20002 starting from the intersection of H Street, NE and Bladensburg Rd, NE.

204.    This area has been a hot bed of gentrification in the last ten years.

205.    It appears that Officer Onoja is motivated at least in part in assisting developers wishing to exclude long-time residents from the area.

206.    Officer Onoja has assaulted and trumped up charges against other people in the area and trumped up false charges against other people in the area on quality of life charges such as POCA and incommoding (23 D.C. Code § 1307) to clear the area's long-time residents from the area as part of the gentrification process.

### The MPD has not meaningfully disciplined Defendant Onoja.

207.    The MPD has not disciplined Defendant Onoja by placing him into non-contact status.

208.    Nor has the District meaningfully disciplined Defendant Onoja in any other way.

### Substantive Allegations for Claims

## Claim 1

## § 1983 Liability of the District of Columbia and Officer Onoja for false arrest under the Fourth Amendment

209.     Mr. Alexander adopts by reference the contents of the preceding paragraphs as if fully set forth herein.

210.     Officer Onoja violated Mr. Alexander's Fourth Amendment rights by arresting him for incommoding without probable cause pursuant to a policy and practice of the District of using the incommoding statute to clear the sidewalks of young African American men by arresting them for incommoding without probable cause.

211.     The District of Columbia is also liable because the District of Columbia has a policy and practice of encouraging and acquiescing in its officers' using the incommoding statute to clear the sidewalks of African Americas by arresting them for crowding, obstructing, or incommoding without probable cause, and because MPD officers approach African American who are standing still on the sidewalk in order to warn or cite them for blocking passage, regardless of the number of persons and regardless of whether they are presenting an obstacle to pedestrian traffic.

212.     Accordingly, Mr. Alexander and the other members of the Arrest Class are entitled to damages and other relief as set forth below.

## Claim 2

## § 1983 Liability of District of Columbia under the Fifth Amendment for unlawful arrests for arbitrary and discriminatory enforcement

213.    Mr. Alexander adopts by reference the contents of the preceding paragraphs as if fully set forth herein.

214.    The D.C. Council amended the incommoding statute effective 2011.

215.    The incommoding statute is vague under the second prong of the vagueness doctrine, the arbitrary and discriminatory enforcement prong.

216.    The statute authorizes and even encourages arbitrary and discriminatory enforcement.

217.    The D.C. Council established minimal guidelines in the statute to govern law enforcement and thus the D.C. Council necessarily entrusted lawmaking to the moment-to-moment judgment of the policeman on his beat.

218.    The MPD enforce it mainly against African Americans.

219.    Mr. Alexander and the other members of the Arrest Class were arrested when the District enforced the unconstitutional incommoding statute against them by arresting them.

220.    Accordingly, Mr. Alexander and the other members of the Arrest Class are entitled to damages and other relief as set forth below.

## Claim 3

## § 1983 Liability of District of Columbia under the Fifth Amendment for unlawful arrests for lack of notice

221.    Mr. Alexander adopts by reference the contents of the preceding paragraphs as if fully set forth herein.

222.    The incommoding statute is vague under the first prong of the vagueness doctrine, the arbitrary and discriminatory enforcement prong.

223.    The statute fails to place reasonable individuals on notice as to what type of conduct constitutes "crowding, obstructing, or incommoding" under the statute or what individuals must do to comply with a "cease crowding, obstructing, or incommoding" warning under the statute.

224.    For example, the statute fails to place reasonable individuals on notice as to whether they must merely "cease crowding, obstructing, or incommoding" or whether they must leave the area, and if so, how far must they go, and how long must they remain away.

225.    The MPD enforce it mainly against African Americans.

226.    Mr. Alexander and the other members of the Arrest Class were arrested when the District enforced the unconstitutional incommoding statute against them by arresting them.

227.    Accordingly, the Named Plaintiffs and the other members of the Arrest Class are entitled to damages and other relief as set forth below.


## Claim 4

## § 1983 Liability of District of Columbia under the Fourth and Fifth Amendment for unlawful prosecutions

228.    Mr. Alexander adopts by reference the contents of the preceding paragraphs as if fully set forth herein.

229.    The incommoding statute is unconstitutional under the second prong of the vagueness doctrine, the arbitrary and discriminatory enforcement prong, in violation of the Fifth Amendment but still the District through its Attorney General's Office prosecuted Mr. Alexander and the other members of the Prosecution Class under the incommoding statute.

230.    The prosecutions are without probable cause because the arrests lack probable cause.

231.    Accordingly, Mr. Alexander and the other members of the Prosecution Class are entitled to damages and other relief as set forth below.

## Rule 23 Class Allegations

232.    Mr. Alexander on behalf of himself and the Arrest Class brings this action under Rules 23(a), 23(b) (2) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of each person who: (i) during the Class Period in the period beginning three years before the date of filing of the original complaint in this case and going forward until the case is terminated; (ii) was arrested for violation of the incommoding statute.

233.    Mr. Alexander on behalf of himself and the other members of the Prosecution Class brings this action under Rules 23(a), 23(b) (2) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of each person who: (i) in the period beginning three years before the date of filing of the original complaint in this case and going forward until the case is terminated; (ii) was prosecuted for a violation of the incommoding statute by the Attorney General of the District of Columbia or with his consent.

234.    Certification of these classes under Federal Rule of Civil Procedure 23(b)(2) is appropriate, because the District of Columbia has a policy, pattern, and practice for each claim that has uniformly affected all members the class, and injunctive relief and declaratory judgment and a judgment against the District will benefit each and every plaintiff and class member.

235.    The classes are entitled to injunctive relief including an injunction prohibiting enforcement of the incommoding statute and sealing of the arrest records of class members for their arrests under the incommoding statute.

236.    Mr. Alexander and the classes are entitled to declaratory judgment against the District that D.C. Code § 22-1307 is unconstitutional and that their arrests and prosecutions on those charges are a nullity.

237.    Certification of these classes under Federal Rule of Civil Procedure 23(b)(3) is also appropriate, in that common questions of law and fact predominate over any individual questions, and class action treatment is superior for the fair and efficient adjudication of these class claims as detailed below.

238.    These classes are entitled to monetary relief.

239.    Regarding Mr. Alexander and these classes, there are no individual questions on the issue of liability, because all members of these classes are injured by the same policy and practices.

240.    Among the questions of law and fact common to the classes are:

a)      whether the incommoding statute D.C. Code § 22-1307 is unconstitutional because it violates the first prong of the vagueness doctrine under the Fifth Amendment, the failure to provide notice prong;

b)      whether the incommoding statute D.C. Code § 22-1307 is unconstitutional because it violates the second prong of the vagueness doctrine under the Fifth Amendment, the arbitrary and discriminatory enforcement prong;

c)      whether the District of Columbia violates the Fifth Amendment by enforcing its incommoding statute in an arbitrary and discriminatory almost exclusively (outside the protestor context) against African Americans;

d)      Whether Mr. Alexander and the members of the classes and future members are entitled to equitable relief, and, if so, what is the nature of that relief.

241.    Each of the Arrest Class and the Prosecution Class is so numerous that joinder of all members is impracticable.  The exact number of the members Arrest Class and the Prosecution Class members is unknown to plaintiffs at this time but the number of persons who were arrested, prosecuted or who "posted and forfeited" for incommoding each year through 2016 numbers at least 50.

242.    Mr. Alexander's arrest claims are typical of the claims of the other members of the Arrest Class, because Mr. Alexander and all other members of the Arrest Class were injured by exactly the same means, unconstitutionality of the incommoding statute.

243.    Mr. Alexander on behalf of himself and the other members of the Arrest Class and the Prosecution Class will fairly and adequately protect the interests of the members of the Classes and they have retained counsel who are competent and experienced in complex federal civil rights class action litigation.

244.    Mr. Alexander on behalf of himself and the Arrest Class and the Prosecution Class has no interests that are contrary to or in conflict with those of the Classes.

### Class Relief Demands

Mr. Alexander on behalf of themselves and all other members of the Arrest Class and the Prosecution Class respectfully request that this Court grant the following relief:

**A.**          Enter judgment in their favor on all of their claims;

**B.**          Declare the incommoding statute under D.C. Code § 22-1307 unconstitutionally vague under the Fifth Amendment and enjoin the District from implementing any provision of D.C. Code § 22-1307.

**C.** Award Mr. Alexander and the putative class members' nominal damages in connection with any declaration that D.C. Code § 22-1307 is unconstitutional or applied unconstitutionally.

**D.** Grant a jury trial on all claims so triable.

**E.** Declare that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and Rule 23(b)(3) and certifying the Arrest Class and the Prosecution Class, and designating Mr. Alexander as the proper representatives of the Arrest Class, and designating Mr. Alexander as the proper representatives of the Prosecution Class, and appointing William Claiborne and Michael Bruckheim and Lynn Cunningham as class counsel of both classes.

**F.** Declare that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a), 23(b) (2) and 23(b)(3).

**G.** Award all the Arrest Class and the Prosecution Class plaintiffs and class members injunctive relief in the form of sealing their arrest records for incommoding and declaring the arrests a nullity;

**H.** Award all plaintiffs and class members compensatory and consequential damages in an amount to be determined at trial;

**I.** Award plaintiffs attorneys' fees and costs incurred in bringing this action under 42 U.S.C. § 1988 or as determined under the "common fund" rule; and

**J.** Grant such other relief as this Court deems just and proper.

| | |
|---|---|
| Respectfully submitted,<br><br>/s/ William Claiborne<br>WILLIAM CLAIBORNE<br>D.C. Bar # 446579<br><br>Counsel for Named Plaintiff Mr. Alexander<br>and the putative Classes<br><br>717 D Street, N.W<br>Suite 300<br>Washington, DC 20004<br>Phone 202/824-0700<br><br>Email claibornelaw@gmail.com | Respectfully submitted,<br><br>/s/ Lynn E. Cunningham<br>LYNN E. CUNNINGHAM<br>DC Bar # 221598<br><br>Counsel for Named Plaintiff Mr. Alexander<br>and the putative Classes<br><br>306 Westview Drive,<br>Dubois, WY 82513<br>Phone: 307-431-4158<br><br>Email: lcunningham@law.gwu.edu |
| Respectfully submitted,<br><br>/s/ Michael Bruckheim<br>MICHAEL BRUCKHEIM<br>D.C. Bar # 455192.<br><br>Counsel for Named Plaintiff<br>Mr. Alexander and the putative Classes<br><br>1 Church St<br># 910<br>Rockville, MD 20850<br>Phone (240) 753-8222 | |

## JURY DEMAND

Plaintiffs demand a jury of six as to all claims so triable.

/s/William Claiborne
WILLIAM CLAIBORNE
D.C. Bar # 446579
Counsel for Named Plaintiff Mr. Alexander
and the putative Classes