## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOSEPH ALEXANDER, | |
| Plaintiff, | |
| v. | Civil Action No: **17-1885 (ABJ)** |
| **GOVERNMENT OF THE DISTRICT OF COLUMBIA,** | |
| Defendant. | |

### PLAINTIFF'S OPPOSITION TO DISTRICT'S MOTION TO DISMISS

The District's motion [24] to dismiss Mr. Alexander's Amended Complaint [22] ("Am. Compl." or sometimes "complaint") should be denied because the District failed to carry its burden of establishing that the complaint does not "include[] 'enough facts to state a claim to relief that is plausible on its face.'" Cohen v. Bd. of Trs. of the Univ. of the D.C., 819 F.3d 476, 481 (2016)(defendant in a motion to dismiss bears the burden of establishing that the complaint fails to state a claim).

### Standard of Review

The defendant in a motion to dismiss bears the burden of establishing that the complaint fails to state a claim, Cohen, 819 F.3d at 481, and the burden never shifts to plaintiff regardless of the sufficiency of the plaintiff's opposition where, as here, the complaint itself adequately states a plausible claim for relief. Wash. All. of Tech. Workers v. United States Dep't of Homeland Sec., 892 F.3d 332, 344–345 (D.C. Cir. 2018).

The issue in a 12(b)(6) motion is the sufficiency of the complaint; plaintiff does not have to establish success on the merits. Skinner v. Switzer, 562 U.S. 521, 530 (2011). A plaintiff's complaint need only provide "a short and plain statement of the claim showing that the pleader is

entitled to relief" in order to survive a motion to dismiss. Johnson v. City of Shelby, 135 S. Ct. 346, 346 (2014)(complaint must give defendants notice of the claims and the factual basis on which they rest grounds upon which they rest, but not the legal theory supporting the claim asserted); Atherton v. D.C. Office of the Mayor, 567 F.3d 672, 681 (2009).

The Supreme Court's holding in Leatherman that federal courts may not apply a "heightened pleading standard' — more stringent than the usual pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure — in civil rights cases alleging municipal liability under ... 42 U.S.C. § 1983" has survived the Court's later civil pleading decisions in Iqbal and Twombly, which require the pleader to allege only a "plausible" claim. White v. City of Chi., 829 F.3d 837, 843-44 (7th Cir. 2016) relying on Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 164 (1993).

At the motion to dismiss stage the reviewing court must treat the complaint's factual allegations as true and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged. Atherton, 567 F.3d at 677; Brown v. Sessoms, 774 F.3d 1016, 1020 (2014); Patterson v. United States, 999 F. Supp. 2d 300, 316 (D.D.C. 2013). Moreover, courts may consider matters of which a court may take judicial notice, EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (1997), so long as these facts are construed in the light most favorable to the plaintiff along with the well pleaded allegations of the complaint. Clatterbrook v. City of Charlottesville, 708 F.3d 549, 557 (4th Cir. 2013).

## I.   Background and Plaintiffs' Allegations in the Amended Complaint.

Mr. Alexander brings this class action complaint challenging two provisions of the District of Columbia's (the "District") "incommoding statute." D.C. Code § 22-1307(1)(A) and (B). He makes several systemic challenges based on deficiencies in the statute and the way the District's Metropolitan Police Department ("MPD") enforces it. The basic factual premise underlying all of

Mr. Alexander's claims is that the MPD treat the statute as a loitering statute because the MPD has a custom of approaching a single person or a group of people (virtually always African American) who are standing still on the sidewalk in order to warn or cite them for "crowding, obstructing, or incommoding," regardless of the number of persons standing still and regardless of whether they are presenting an obstacle to pedestrian traffic, and arresting people who refuse to leave the area when warned. Am. Compl. ¶ 6, 63, 68, 85, 203; see OPC Report p. 2.[1] Even the Office of Police Complaints, the District agency charged with being an early warning system for police misconduct, is on record as accepting the basic factual premise of Mr. Alexander's Amended Complaint that experience shows that the MPD enforce the incommoding statute (which the OPC/PCB call the "blocking passage" statute) in an arbitrary and discriminatory manner against African Americans. OPC Report, pp. 3-4. An example from the Report illustrates. "Get off the sidewalk!" yelled one

---

[1] The "OPC Report" is the report issued by the Police Complaints Board ("PCB") based on complaints received by the Office of Police Complaints (OPC) covering the period md 2013 to January 2017 detailing how the MPD, in general, approach people, especially African American people, who are standing still on the sidewalk in order to warn or cite them for blocking passage, regardless of the number of persons and regardless of whether they are presenting an obstacle to pedestrian traffic. PCB Policy Report #17-3: Blocking Passage ("Blocking Passage Report" or "OPC Report"), p.2. The Office of Police Complaints in conjunction with the Police Complaints Board issues policy recommendations when a pattern of conduct in need of improvement is identified through its oversight activities. D.C. Code § 5-1104(d). The PCB issued the report pursuant to D.C. Code § 5-1104(d). The OPC is the successor to the CCRB (Citizen Complaints Review Board). https://policecomplaints.dc.gov/page/statute-and-regulations; see D.C. Code § 5-1101 et seq. The Report is admissible against the District pursuant to Fed. R. Evid. 801(d)(2)) and Fed. R. Evid. 803(8). It can be considered as part of the Amended Complaint under EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (1997) (stating that the court may take into account "matters of . . . judicial notice" in addition to the pleadings). This Court may take may take judicial notice of the fact of the promulgation and the contents of the report without converting the motion to dismiss into a motion for summary judgment. Marshall Cnty. Health Care Auth. v. Shalala, 988 F.2d 1221, 1222 (1993). Courts routinely accept postings on "government websites" as public records meeting the exception under Rule 803(8) and as inherently authentic and selfauthenticating under FRE 902(5). Williams v. Long, 585 F. Supp. 2d 679, 685-689 (D. Md. 2008)(proponent of ESI could use the URL, date, and/or official title on a printed webpage to show that the information was from a public authority's website, and therefore, self-authenticating); Lester v. Natsios, 290 F. Supp. 2d 11, 26 (D.D.C. 2003).

officer at a mother and her children who were standing on the sidewalk on 13th Street, S.E., near the Congress Heights metro station. OPC Report, pgs 2-3. The officer then left, returned, and continued bellowing, "I said, get off the sidewalk!" Id. at 3. And so they left. *Id.* The OPC Report further states that the incommoding statute is "strikingly similar to the loitering and vagrancy laws in other jurisdictions." *Id.* at 3.

### A.  Mr. Alexander's Claims and the Relief He Seeks.

Mr. Alexander pleaded 4 "Monell" claims against the District.

To establish a Monell claim a plaintiff must establish both: (1) a predicate constitutional violation; and (2) the municipality's policy or was the moving force behind the predicate constitutional violation) *citing* Baker v. District of Columbia, 326 F.3d 1302, 1306 (D.C. Cir. 2003).

### 1.  *The predicate constitutional violation underlying each claim.*

The predicate constitutional violation underlying each claim is listed below. *See* Harris v. Gov't of the D.C., 2019 U.S. Dist. LEXIS 131297, *7 (D.D.C. 2019).

**Claim 1 (Fourth Amendment ):** Officer Onoja lacked probable cause to arrest Mr. Alexander, Am. Compl. ¶¶ 233-237; 777

**Claim 2 (Fifth Amendment):** the incommoding statute is vague under the second prong of the vagueness doctrine, the arbitrary and discriminatory enforcement prong, as applied, *Id.* ¶¶ -245;

**Claim 3 (Fifth Amendment):** the incommoding statute is vague facially and as applied under the first prong of the vagueness doctrine, the lack of fair notice prong, Claim 3, *Id.* at ¶¶ 246-252;

**Claim 4 (Fifth Amendment):** the District through the MPD intentionally enforces the statute in a racially discriminatory manner by making arrests and issuing citations under the statute and issuing move on orders under the statute virtually exclusively against African Americans, *Id.* at ¶¶ 253-255.

### 2.  Mr. Alexander's _Monell_ claims against the District.

The D.C. Circuit has recognized four ways of proving a _Monell_ claim: (1) the existence of an explicit government policy; (2) the action of a government policymaker; (3) the fact that a policymaker knowingly ignored a practice that was consistent enough to create a custom; or (4) the fact that the government failed to "respond to a need . . . in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations." _Harris_, 2019 U.S. Dist. LEXIS 131297, *8 citing _Baker_, 326 F.3d at 1306 (citations omitted).

Mr. Alexander has two independent theories of the District's liability under _Monell_ for each of the "as applied" claims: (A) _Baker_ prong 3: a policymaker knowingly ignored a practice that was consistent enough to create a custom, and/or, alternatively, _Baker_ prong 3: the District failed to "respond to a need . . . in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations." _Harris_, 2019 U.S. Dist. LEXIS 131297, at *8.

Mr. Alexander's theory of municipal liability for his claim that the incommoding statute is facially vague under the first prong of the vagueness doctrine, the lack of fair notice prong, is _Baker_ prong 1. _Id._

Mr. Alexander's claims in this case are like the plaintiffs' claims in the summary judgment opinion in _Barnes_ because he relies on three different theories of _Monell_ liability: _Baker_ prong 1 (unconstitutional municipal policy); _Baker_ prong 3 (policymaker knowingly ignored a practice that was consistent enough to create a custom); and _Baker_ prong 4 (District failed to "respond to a need . . . in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations). _Barnes v. District of Columbia_, 793 F. Supp. 2d 260, 282-285 (D.D.C. 2011).

In <u>Barnes</u> plaintiffs challenged the DC Jail's (1) over-detentions; and (2) its strip-search policy as applied to "court returns entitled to release," that is, persons returning to the jail from court after having been ordered released at their court appearances. Plaintiffs challenged the strip-search policy as an official <u>Monell</u> policy formally adopted by a policymaker that was unconstitutional as "routinely" applied to them and other court returns entitled to release returned to the DC Jail.

There were two types of over-detentions: (1) one night over-detentions caused by the "10 p.m. cut-off" rule, a statute enacted by the D.C. Council that prohibited the DC Jail from releasing inmates after 10 p.m. at night; (2) and longer over-detentions caused by the general inability of the Jail's "Records Office" to release inmates on time. Plaintiffs challenged the "10 p.m. cut-off" rule under <u>Baker</u> prong 1 as a formally adopted, unconstitutional policy. <u>Barnes</u>, 793 F. Supp. 2d 260, 282-285 (summarizing theory of liability applicable to each type of over-detention).

Plaintiffs challenged the longer over-detentions under the same two "custom" based theories of municipal liability Mr. Alexander relies on in this case, <u>Baker</u> prong 3 and <u>Baker</u> prong 4. As Judge Lamberth formulated them:

> Plaintiffs' primary argument ... for why the District is liable for the overdetention problems at the DOC is that they were caused by the District's deliberate indifference. [<u>Baker</u> prong 4]... However, plaintiffs also claim, as a separate basis for Section 1983 liability, that the overdetention problem is the result of official "acquiescence in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity." (quoting Jett). [<u>Baker</u> prong 3]

<u>Barnes</u>, 793 F. Supp. 2d at 283.

### 3. An alternative and independent basis of the District's liability for Claim 1

The two <u>Monell</u> "custom" claims described above are based on the District's custom of enforcing its incommoding statute regardless of which MPD officer made the arrest.

An alternative and independent basis of the District's liability for Claim 1 is the District's custom of knowingly ignoring or deliberate indifference to Officer Onoja's own practice of

arresting people without probable cause and his other unconstitutional conduct, not just the MPD's general practice of arresting people for violations of the incommoding statute without probable cause, and the District knowingly ignores Officer Onoja's custom, and the District is deliberately indifferent to Officer Onoja's method of policing the community, Am. Cmpl. ¶¶ 234, 236. Although the custom is based on Officer Onoja's conduct, the District made his custom its own by knowingly ignoring it or being or deliberately indifferent to it.

### 4.  *Relief Mr. Alexander seeks.*

Mr. Alexander brings this case as a class action. As relief, Mr. Alexander seeks compensatory damages for himself and the putative class. Class Relief Demands, ¶ I. He also seeks nominal damages and declaratory relief for himself and the class, *Id.* ¶¶ C and D. Finally, Mr. Alexander seeks for himself and the class injunctive relief in the form of sealing their arrest records for incommoding and declaring their arrests a nullity, *Id.* ¶ H.

In a footnote the District contends that Mr. Alexander's allegation that the class definition in Agnew tolled the running of the statute of limitations in this case under Fed. R. Civ. P. 12(e). Whether the class definition in Agnew tolled the running of the statute of limitations in this case per Am. Pipe & Constr. Co. v. Utah, 414 U.S. 538, 449-50 (1974) depends in part on whether Mr. Alexander and other class members were justified in relying on the Agnew Plaintiffs, China Agritech, Inc. v. Resh, 138 S. Ct. 1800, 1810 (2018), and they were, at least for some of the time, on some claims, because in Agnew the parties agreed to stay plaintiffs' obligation to file a motion for class action treatment (Consent Motion [13] to Stay) and the Court entered a stay of plaintiffs' obligation to file a motion for class action treatment. Minute Order docketed 6/25/2015 granting motion to stay. This is a complicated substantive that is not suitable for Fed. R. Civ. P. 12(e). Defendant's contention that allegations about the Agnew plaintiffs and Officer Onoja should be struck under Fed. R. Civ. P. 12(b)(1) or (6) is ludicrous since the allegations go to establishing a

custom, the District policymakers' notice of it, and deliberate indifference. *See e.g.*, <u>Harris</u>, 2019 U.S. Dist. LEXIS 131297, *13 (D.D.C.  2019)(other litigation about the claim at issue gives rise to knowledge).

**B.  Mr. Alexander's Arrest for "Crowding, Obstructing, or Incommoding" the Sidewalk.**

MPD Officer Onoja and several other MPD officers arrested Mr. Alexander, a young African American man, for "crowding, obstructing, or incommoding" the use of the sidewalk on Saturday August 8, 2015, about 5:30 p.m. Am. Compl. ¶ 41, *et seq.*

Mr. Alexander was standing at the intersection of the alley and the sidewalk next to the "Stanton" store, at 1044 Bladensburg Road, N.E. in Washington, DC, a popular neighborhood convenience store where people gather and buy snacks and drink, when Officer Onoja arrived. Am. Compl. ¶¶ 32-33; 35; Figure 5. Mr. Alexander was not blocking passage nor was he presenting an obstacle to other pedestrian traffic as the still in ¶ 32 shows. Am. Compl. ¶¶ 33, 35, 47. Pedestrians, even a pedestrian with two dogs on a leash, were able to saunter past, as the picture shows (Mr. Alexander is out of the frame in the alley behind the young man in the white tee shirt). Am. Compl. ¶ 32. No one else was trying to use the same space and no one else's use of the sidewalk was obstructed. *Id.* at 49-50. Nor did Mr. Alexander partially or fully obstruct the sidewalk. *Id.* No allegations or pictures in the Amended Complaint suggest any vehicle ever tried to enter the drive while Mr. Alexander was there.

Nonetheless, Officer Onoja ordered Mr. Alexander to leave the area when Officer Onoja rode up on his bicycle and saw Mr. Alexander standing there. Am. Compl. ¶ 36 and following photo ((Mr. Alexander is in the tee shirt with white and black sneakers). Moreover, Officer Onoja did not simply instruct Mr. Alexander to "cease the crowding, obstructing, or incommoding" as the statute provides; in fact, Officer Onoja never told Mr. Alexander exactly what conduct he believed violated the statute, so Mr. Alexander did not know what he needed to "cease" doing to cure the

violation. Instead, Officer Onoja issued a "dispersal order" or "move on order" and ordered Mr. Alexander to leave the area. Am. Compl. ¶ 52.

Mr. Alexander did leave the area but over the next five minutes Mr. Alexander walked up and down the sidewalk in front of the store a few times. Am. Compl. ¶ 37. Officer Onoja radioed for back up and three officers arrived. *Id.* at 38. The still shows their two squad cars blocking the entrance to the drive intersecting the sidewalk Mr. Alexander had been using. *Id.*

Officer Onoja and the other officers stood in the sidewalk near the alley for about a minute before Mr. Alexander came back down the street. Am. Compl. ¶ 38. As Mr. Alexander walked back down the sidewalk and as he passed the alley Officer Onoja let him pass and then grabbed him from behind. Am. Compl. ¶¶ 39-40. Several officers then converged on Mr. Alexander and they hand cuffed him and arrested him. *Id.* at ¶ 41. They took him to the station and then they released him from the station on a citation. *Id.* at 42-43.

## C. The District of Columbia's Anti-Obstructing Statute.

D.C. Code § 22-1307(a) makes it unlawful for a person, alone or in concert with others:

> (1) To crowd, obstruct, or incommode:
>
> (A) The use of any street, avenue, alley, road, highway, or sidewalk;
>
> (B) The entrance of any public or private building or enclosure;
>
> ...; and
>
> (2) To continue or resume the crowding, obstructing, or incommoding after being instructed by a law enforcement officer to cease the crowding, obstructing, or incommoding.

D.C. Code § 22-1307 (2013 Supp.). The statute was enacted in its current form in 2011.[2] Bill 18-425, the "Disorderly Conduct Amendment Act of 2010"; <u>Duffee v. D.C.</u>, 93 A.3d 1273, 1275

---

[2] D.C. Act 18-693, § 302 (a), 58 D.C. Reg. 640, 644 (2011) (emergency legislation)(attached as Ps. Ex. # 1); D.C. Act 19-45, § 302 (a), 58 D.C. Reg. 3701, 3705 (2011) (second emergency

(D.C. 2014). In 2013 the District added new sections dealing with protests but it did not make any changes to Sections (1)(A) or (B), the sections Mr. Alexander challenges. Agnew, 920 F.3d at 57. Ps. Ex. # 2 shows the changes made in 2013.

The major changes to the statute made by the Disorderly Conduct Amendment Act of 2010 (the "2011 Amendments") were: (1) eliminating the "congregate and assembly" element (which also eliminated the "unlawful purpose" *mens rea* element imported from common law unlawful assembly) which courts had interpreted to require a minimum of three people to "crowd, obstruct, or incommode" the use of a sidewalk; (2) replacing the "congregate and assembly" element with the phrase, "a person, alone or in concert with others," thereby reversing the judicial interpretation that "crowding, obstructing, or incommoding" required a minimum of three people so that the statute could be applied against just one person; (3) eliminating any *mens rea* element; and (4) substituting a "cease incommoding" or "move on order" for the *mens rea* requirement (but rejecting any narrowing qualifications such as duration qualifications on the dispersal order). *See* Committee Report, pp. 6-7 (Report on Bill 18-425, the "Disorderly Conduct Amendment Act of 2010"). http://lims.dccouncil.us/Download/22580/B18-0425-CommitteeReport1.pdf

The statute "plainly identifies **two separate actus reus circumstance elements** that must be satisfied before a person's conduct becomes criminal." Hooks v. United States, 208 A.3d 741, 749 (D.C. 2019). First, a person must "crowd, obstruct, or incommode" one of several enumerated locations including sidewalks, § 22-1307(a)(1)(A—D). *Id.* Second, the person must "continue or

---

legislation); D.C. Act 18-699, § 2 (a), 58 D.C. Reg. 731 (2011) (permanent legislation). Duffee v. D.C., 93 A.3d 1273, 1275 (D.C. 2014).  D.C. Law 18-375 became effective on May 26, 2011. The text is at https://code.dccouncil.us/dc/council/laws/docs/18-375.pdf. The D.C. Council added sections which became effective in June 2013 (mainly the parts codified at 22-1307(b) dealing with demonstrators) but it did not change the sections Mr. Alexander challenges, D.C. Code § 22-1307(a)(1)(1)(a) and (B) and (2).  D.C. Law 19-320 http://lims.dccouncil.us/Download/26401/B19-0645-SignedAct.pdf

resume the crowding, obstructing, or incommoding after being instructed by a law enforcement officer to cease." § 22-1307(a)(2). *Id.* The D.C. Circuit in <u>Agnew</u> also held that the statute has two stand-alone elements. <u>Agnew v. Gov't of the D.C.</u>, 920 F.3d 49, 58-59 (D.C. Cir. 2019)(an officer must have probable cause to that a person is violating the first element – "crowding, obstructing, or incommoding" – before issuing a ceasing incommoding order, and "the person cannot be arrested unless he ignores the officer's directive and decides to keep obstructing.").

### D. Mr. Alexander's Arrest Illustrates how the MPD Enforce the Incommoding statute as a Loitering Statute against African Americans (MPD Enforcing It against a Single Person Standing Still on the Sidewalk).

Mr. Alexander' arrest illustrates how the MPD enforce the incommoding statute by: (1) treating a single person's standing alone on the sidewalk (whether or not other people are around, and whether or not any other person's use is impeded by their use, that is, "partial blocking") as "crowding, obstructing, or incommoding" the use of the sidewalk; and (2) virtually always against African Americans in an arbitrary and discriminatory manner.

First, he is African American. Next, he was not "crowding, obstructing, or incommoding" anyone's use of the sidewalk. Rather, he was using the sidewalk as intended. His arrest illustrates that the MPD apply the statute even to someone standing alone or with one or two or a few other people on the sidewalk even when there is plenty of room on the sidewalk for other people to get by or walk around on the sidewalk. Moreover, instead of simply instructing Mr. Alexander to "cease the crowding, obstructing, or incommoding" as the statute provides, Officer Onoja instead issued a "banishment" or "move on order" and ordered Mr. Alexander to leave the area.

Officer Onoja's arrest of Mr. Alexander mirrors the MPD's treatment of Bill Hassay in 2011 (described in the following section), save that Mr. Hassay left the area to avoid arrest. Moreover, Mr. Alexander's arrest also fits to a "T" the profile of the police-community member encounters described in the "OPC Report" (discussed in detail below) prepared by the OPC, that is, the

Office of Police Complaints, which serves as an independent "watch dog" agency overseeing the MPD. The OPC Report stated in part, "[The] witness officer ... said that in general, they approach people who are standing still on the sidewalk in order to warn or cite them for blocking passage, regardless of the number of persons and regardless of whether they are presenting an obstacle to pedestrian traffic." OPC Report, p. 2.

### E. The ACLU Warned the Committee on the Judiciary at a Hearing in February 2012 Held to Review the Implementation of the Incommoding Statute that the MPD Were Enforcing It against a Single Person Standing Still on the Sidewalk.

The ACLU warned the D.C. Council (through its Committee on the Judiciary) at a hearing in February 2012 held to review the implementation of the revised incommoding statute that the MPD were enforcing it against a single person standing still on the sidewalk, even if they were not impeding the free use of the sidewalk by other people ("partial blocking"). Am. Compl. ¶ 93. In 2011, Bill Hassay, Jr., a "busker" (musician playing for tips) performing at the corner of Wisconsin and M St., NW, was threatened by an MPD police officer with arrest for blocking the sidewalk, and made to "move on" out of the area, because he was "occupying" a part of the sidewalk but not blocking the entire sidewalk. *Id.* at 90. The officer told Mr. Hassay that "pedestrians need the full width" of the sidewalk. *Id.* Moreover, groups working with the homeless reported that other officers in Georgetown were enforcing the statute in the same way against homeless persons. On February 1, 2012, the D.C. Council, Committee on the Judiciary, held a hearing attended regarding the implementation of the 2011 revisions to the disorderly conduct statute where the ACLU presented written and oral testimony about the MPD's enforcement of the statute against Bill Hassay, *Id.* at 93, and the homeless people. *Id.* at 94. ACLU testimony before Committee on the Judiciary of the Council of the District of Columbia, hearing on Implementation and Effects of Recent Revisions to the Disorderly Conduct Law, February 1, 2012. ("ACLU written testimony") Available on ACLU website

https://www.acludc.org/sites/default/files/docs/Disorderly%20conduct%20oversight%20testimony%20final_0.pdf

"Partial blocking" of the sidewalk refers to the "blocking" that occurs when one person occupies space on the sidewalk by standing or walking on it. "Total" or "full blocking" refers to where one person obstructs the whole way, such as with belongings, a cart, or obstructive behavior. *See* ACLU written testimony. Under the previous version of the statute, "partial blocking" was held not to constitute "crowding, obstructing, or incommoding" the use of the sidewalk, in large part because the statute applied only when "any person or persons within the District of Columbia [] congregate and assemble" and block the sidewalk or other public space, and the District of Columbia Court of Appeals interpreted the phrase "congregate and assemble" to require at least three people. Odum v. District of Columbia, 565 A.2d 302, 304 (D.C. 1989) (interpreting the words "congregate and assemble" to mean that at least three people were required to "congregate and assemble" so that one person acting alone could not "crowd, obstruct, or incommode" the use of the sidewalk).

But, the 2011 Amendment eliminated the words "congregate and assemble" and replaced them with the phrase, "a person, alone or in concert with others." The ACLU informed the Judiciary Committee that elimination of the "three or more person" congregating element from the statute led MPD officers to believe that one person standing still on the sidewalk even if no one else was using the sidewalk they occupied or even if no one else were present constituted "crowding, obstructing, or incommoding" the use of sidewalk under the revised statute. ACLU written testimony, at 1. The ACLU suggested the statute be amended to add a definition of "incommoding" as "blocking an entire sidewalk so that others cannot get past." *Id.*

Kelly O'Meara, Director of the MPD's Office of Strategic Change, testified at the February 1, 2012 hearing that after the enactment of the changes to the District's disorderly conduct law, MPD

instituted some training but that the materials, ¶ 95, but that neither the written directive nor the online training session addressed the issue of whether partial blocking was sufficient to justify an arrest, nor covered using the incommoding statute as a way for the MPD to control the streets without supervision of prosecutors or the courts. At ¶ 96. 97.Councilmember Mendelson explained to the MPD that disorderly conduct offenses can be easily misunderstood and suggested to O'Meara that the MPD undertake intensive training. *Id.* at 97.

### F. The issue of whether the current version of the statute allows arrests for a single person "partially blocking" the sidewalk has been litigated many times and the District always takes the position that it does.

The issue of whether the current version of the statute authorizes the arrest of a single person "partially blocking" the sidewalk (after disobeying an officer's order to move on) has been litigated many times and the District always takes the position that it does, because, the District contends, a single person standing on the sidewalk even when no one else is around or no one else's use of the sidewalk is thereby impeded constitutes "crowding, obstructing, or incommoding" the use of the sidewalk. For example, on April 11, 12, and 13, 2012, MPD officers arrested at least eleven Occupy protestors for "partial blocking" of the sidewalk (that is, occupying part of the sidewalk even if no one else wants to use it) by sitting or standing on a thin strip of the sidewalk adjacent to a building façade on a 40 foot wide sidewalk in downtown District of Columbia. Amended Complaint [16], ¶¶ 60-67, Jeweler et al., v. District of Columbia et al, (12-1843 (RWR/PJF)). The protestors filed suit alleging the MPD lacked probable cause to arrest them for "crowding, obstructing, or incommoding" the use of the sidewalk, *Id.* The issue of partial blocking was thoroughly litigated in this lawsuit and the ACLU even filed an amicus brief [77] in opposition to defendants' motion to dismiss and in support of plaintiffs' argument that partial blocking did not constitute "crowding, obstructing, or incommoding" the use of the sidewalk under the incommoding statute. The District moved [54] to dismiss the eleven plaintiffs' false arrest claims

on the grounds that the statute allowed arrests for "partial blocking." District's Motion to dismiss p. 52.

In <u>Rashad Bey v. District of Columbia et al</u>., the District also argued that standing in a private yard (known to the arresting officer to be private) next to the sidewalk when no one else was around constituted "crowding, obstructing, or incommoding" the use of the sidewalk. <u>Rashad Bey v. Government of the District of Columbia, et al</u>., 2014 CA 003511 B, Defendants' Motion for Summary Judgment, p. 4 (docketed 05/26/2015).

In this case the District contends that Officer Onoja had probable cause to believe that Mr. Alexander was "crowding, obstructing, or incommoding" the use of the sidewalk when he was simply standing still on a broad sidewalk where other pedestrians had ample room to walk by. District's Memorandum [24-1], pp. 9-10.

In each of these cases the District of Columbia's Office of the Attorney General represented the District as a defendant, and the positions the Attorney General and their assistants take in their papers are the position of the District. <u>United States v. Gregory</u>, 871 F.2d 1239, 1243 (4th Cir. 1989)(county attorney's extra-judicial statements on a client's behalf admissible Fed. R. Evid. 801(d)(2)); <u>Lechoslaw v. Bank of Am., N.A.</u>, 618 F.3d 49, 57 (1st Cir. 2010)(statements by attorney during course of representation admissible against client if party); Fed. R. Evid. 801(d)(2).

## II.  Mr. Alexander in Claim 1 Plausibly Pleaded both a Predicate Constitutional Violation and a <u>Monell</u> Claim.

As explained above, Mr. Alexander relies on numbers 3 and 4 of the "<u>Baker</u> theories" to establish the <u>Monell</u> claim that the District had a custom of arresting people under the statute without probable cause in the manner illustrated by Mr. Alexander's arrest and the examples in the OPC Report: "[(3)] the fact that a policymaker knowingly ignored a practice that was consistent enough to create a custom; or [(4)] the fact that the government failed to "respond to a need . . . in

such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations.".<u>" Harris</u>, 2019 U.S. Dist. LEXIS 131297, *8.

Additionally, ¶¶ 234-236 establish that the District's policymaker knowingly ignored Officer Onoja's custom of making illegal arrests, and the District was deliberately indifferent to the obvious risks of Officer Onoja's history of unconstitutional conduct towards community members.

### A. The Amended Complaint Plausibly Pleaded a Predicate Constitutional Violation because Officer Onoja Lacked Probable Cause to Arrest Mr. Alexander.

Under the 4th Amendment probable cause must be based on facts actually known by the officer at the time of the arrest. <u>Devenpeck v. Alford</u>, 543 U.S. 146, 152-153 (U.S. 2004). Probable cause to arrest requires at least some evidence supporting each element of the offense. <u>Hall v. District of Columbia</u>, 867 F.3d 138, 154 (2017). The burden is on the government to establish probable cause existed in a warrantless arrest such as this one. <u>United States v. Bowyer</u>, 985 F. Supp. 153, 156 (D.D.C. 1997)(in warrantless arrests, government bears burden of proving arrests were legal).

The statute "plainly identifies **two separate actus reus circumstance elements** : (1) a person must "crowd, obstruct, or inconmode" one of several enumerated locations, and (2) the person must "continue or resume the crowding, obstructing, or incommoding after being instructed by a law enforcement officer to cease." § 22-1307(a)(2). <u>Hooks</u>, 208 A.3d at 749; <u>Agnew</u>, 920 F.3d at 58-59 (an officer must have probable cause to that a person is violating the first element – "crowding, obstructing, or incommoding" – before issuing a ceasing incommoding order).

The District states that "Plaintiff's own allegations therefore show that Officer Onoja had probable cause to find that plaintiff violated D.C. Code § 22-1307(a)." Motion, p. 9. But, significantly, the District does not even lay out the elements of the offense, *Id.*, even though the Supreme Court has indicated that the analysis of whether a claim is "plausible" begins with a

consideration of the elements of the claim. <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 675 (2009). Without a statement of the elements the Court cannot evaluate whether the allegations Mr. Alexander pled state a claim under the statute. On this basis alone the District's motion to dismiss should be denied because the District utterly failed to carry its burden of establishing that the complaint fails to state a claim.  <u>Cohen</u>, 819 F.3d at 481; <u>Wash. All. of Tech. Workers</u>, 892 F.3d at 344–345.

Instead, the District cherry picks some of the facts that Mr. Alexander pleaded and disregards others and then selectively presents its version of the allegations in a misleading presentation, and tendentiously states without legal analysis that Mr. Alexander failed to plead a plausible predicate constitutional violation. The District contends that the following facts establish probable cause to arrest under the statute: (1) Mr. Alexander was "standing at the intersection of the alley and the sidewalk in the alley" (as the still photograph shows) and that individuals were able to pass by on the sidewalk; Officer Onoja instructed him to move on [actually, Officer Onoja instructed Mr. Alexander to leave the area, Am. Compl. ¶ 36]; although Mr. Alexander he initially left the area, he later "walked up and down the sidewalk a few times" while Officer Onoja was present. Motion, p. 9-10.

All the District establishes with this analysis is that Officer Onoja's arrest of Mr. Alexander (1) mirrors the MPD's encounter with Mr. Hassay that the ACLU warned the D.C. Council about in 2012, ACLU written testimony; and (2) fits to a T the profile of arrests for incommoding that the OPC Report found, OPC Report 2; and (3) shares a "common design" with the custom of arrests Mr. Alexander details below in the section on "existence of a custom."

The statute applies only to observed obstacles or blockages. <u>Agnew</u>, 920 F.3d at 58. The statute does not punish conduct that has no effect on other members of the public; it is violated only by actual or imminent obstruction of another person. *Id.* The provision applies only to crowding, obstructing, and incommoding "the use of" the specified places by other people. Unless

there is someone else who is trying to use the same space and whose use is obstructed, the statute by its own terms is not violated and no "move on" directive is warranted. *Id.* As the <u>Agnew</u> Court pointed out, every use of the sidewalk by one person will necessarily prevent the simultaneous use by anyone else of the precise space she occupies. When one person walks on a sidewalk, drives down a street, picnics in a park, or sits and rests awhile on a plaza's bench, she will necessarily prevent the simultaneous use by anyone else of the precise space she occupies—in some sense blocking another's use. But such conduct, and the bare physical displacement of others that it inevitably entails, does not alone qualify as "obstruct[ing], crowd[ing] or incommod[ing] the use" of those places. *Id.*

Mr. Alexander was not obstructing "the use of the sidewalk" or the alley because there was no one else who was trying to use the same space and whose use was obstructed. *Id.*

Finally, the statute vests no "banishment power" in police officers. "Individuals need not vacate the public space altogether, they must simply stop blocking the use of the way or place at issue." *Id.* at 60. So, Officer Onoja's move on order was not supported so Mr. Alexander was not obliged to obey it. Moreover, Officer Onoja never told Mr. Alexander exactly what conduct he believed violated the statute, so Mr. Alexander did not know what he needed to "cease" doing to cure the violation. Instead, Officer Onoja issued a "banishment order" and ordered Mr. Alexander to leave the area. Am. Compl. ¶ 52.

### B.  The Complaint Alleges Sufficient Facts to Support Municipal Liability.

The relevant part of Section 1983 reads: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of ... the District of Columbia, subjects, or causes to be subjected, any ... person ... to the deprivation of any rights ... secured by the Constitution and laws, shall be liable to the party injured..." A good description of the difference between a formal policy and a practice, custom or usage that is so widespread and so persistent that it has the force of law is

set forth in <u>Britton v. Maloney</u>, 901 F. Supp. 444 (D. Mass. 1995). Unlike a policy, which is established by the top-down affirmative decision of a policymaker, a custom develops from the bottom up. *Id.* at 450. It is the subordinate, lower level, non-policymaking employees that engage in a certain practice or custom which becomes "the way things are done." *Id.*

   In a "straight line" <u>Monell</u> claim like this where Mr. Alexander alleges that the District's unconstitutional statute or custom of unconstitutionally applying it caused his constitutional violations all a plaintiff has to do is prove that the unconstitutional municipal policy or custom was the moving force in causing the constitutional violations, and the plaintiff can prove that causation element simply by proving the existence of the unconstitutional municipal policy or custom. <u>Jauch v. Choctaw Cnty.</u>, 874 F.3d 425, 435 (5th Cir. 2017). At the motion to dismiss stage a well pleaded allegation that a municipal policy or custom is itself unconstitutional establishes the necessary causal connection between the municipality and the constitutional deprivation, because an employee's act of enforcing an unconstitutional municipal policy may be considered the act of the municipality itself. <u>Amnesty Am. v. Town of W. Hartford</u>, 361 F.3d 113, 125 (2d Cir. 2004).

### C.  "Custom and Practice" Liability.

   The <u>Baker</u> Court's formulation of the third prong of <u>Monell</u> liability is: (1) a policymaker (2) knowingly ignored (3) a practice that was consistent enough to create a custom. <u>Baker v. District of Columbia</u>, 326 F.3d 1302, 1306 (D.C.Cir. 2003). The <u>Baker</u> Court's formulation is a summary of existing Supreme Court and Circuit law. <u>Jett v. Dall. Indep. Sch. Dist.</u>, 491 U.S. 701, 737 (1989)(policymakers' "acquiescence in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity" can be the basis for section 1983 liability); <u>Triplett v. District of Columbia</u>, 108 F.3d 1450, 1453 (1997)(noting inaction giving rise to or endorsing a custom by a person or persons who have final policymaking authority under state law can be the basis for section 1983 liability). Both the Supreme Court, the D.C. Circuit, and this

Court have traditionally used the term "acquiescence" instead of "knowingly ignored." Jett, 491 U.S. at 737; Triplett, 108 F.3d at 1454 (liability where final policymakers "acquiesced in a longstanding practice or custom which constitutes the "standard operating procedure' of the local governmental entity"); Barnes v. District of Columbia, 242 F.R.D. 113, 118 (D.D.C. 2007) (plaintiffs allege, in essence, *citing* Jett and Triplett, that the inefficient implementation of the District's release procedures is the result of official "acquiescence in a longstanding practice or custom which constitutes the standard operation procedure of the local government entity). It does not appear that the Baker Court intended a change in the law by the change in formulation from "acquiesce" to "knowingly ignore."

### 1. *A Policymaker Knowingly Ignored a Practice That Was Consistent Enough to Create a Custom.*

Mr. Alexander alleges that the District through its MPD follows a custom of arresting people for "crowding, obstructing, or incommoding" without probable cause by arresting people for "crowding, obstructing, or incommoding" or issuing them "move on" orders even when they were not actually "crowding, obstructing, or incommoding" the use of the sidewalks.

This custom - like the policy in Monell - is itself unconstitutional. Petrello v. City of Manchester, 2017 U.S. Dist. LEXIS 144793, at *19-20 (D.N.H. Sep. 7, 2017)(policy or custom of arresting people for panhandling pursuant to disorderly conduct statute without probable cause was itself unconstitutional under the First Amendment); Barnes, 242 F.R.D. at 118 (unconstitutional custom of over-detentions); Cole v. City of Memphis, 97 F. Supp. 3d 947, 959 (W.D. Tenn. 2015) (police had a custom of clearing the sidewalks and streets of the Beale Street nightclub area in Memphis of people around 2:00 a.m. by ordering them to leave regardless or safety or other justification for the sweeps; because custom was unconstitutional proof of custom also established causation).

Since the custom is itself unconstitutional Mr. Alexander does not have to separately establish causation or deliberately indifference on this theory. <u>Cole</u>, 97 F. Supp. 3d at 959 (assuming the Beale Street Sweep custom as alleged is factually established, the existence of the custom also establishes the City's responsibility for the custom); <u>Stokes v. P.O. Ewing #8653</u>, 2017 U.S. Dist. LEXIS 77489, at *9 (N.D. Ill. May 22, 2017)(Complaint need not plead facts concerning "deliberate indifference" when the basis of liability is an unconstitutional custom); <u>Amnesty Am.</u>, 361 F.3d at 125.

Moreover, the complaint alleges that Chief – the policymaker for MPD – and the D.C. Council had actual knowledge of the MPD custom before Mr. Alexander's arrest. The Judiciary Committee held hearings at which the ACLU informed them of the custom and the Chief was present or at least sent a delegate. The Chief watched a video of two of her officers enforcing the statute as Mr. Alexander and she did nothing about it, thereby adopting the custom long before Officer Onoja enforced the custom against Mr. Alexander. Yet, the District did nothing as the proof of the existence of the custom until at least 2017 below shows. <u>Triplett</u>, 108 F.3d at 1453 (municipal liability may be founded on "inaction giving rise to or endorsing a custom").

*2.   Existence of the custom or usage.*

There is no numerical standard which controls the determination whether incidents of wrongful behavior cumulatively show a pattern amounting to a custom or policy. <u>Carter v. District of Columbia</u>, 795 F.2d 116, 124 (1986). Egregious instances of misconduct, relatively few in number but following a common design, may support an inference that the instances would not occur but for municipal tolerance of the practice in question. *Id.* So an informal custom or usage can be proven not only by **a large number of instances** but also by **other evidence that it is routine practice**. *See* <u>Davis v. Carter</u>, 452 F.3d 686, 692-94 (7th Cir. 2006) (plaintiff proved a municipal policy of excessive delay in providing methadone treatment, submitting evidence that

administrative practices made delays inevitable and staff testimony that they were widespread; he was not required to cite other individuals who suffered from the delays); Barnes, 242 F.R.D. at 119 (denying motion to dismiss on claim where indiscriminate strip search policy routinely applied to detainees).

Mr. Alexander pleaded both a large number of instances but also other evidence that it is routine practice: numerous instances of misconduct, a report prepared by a police watchdog, testimony before the D.C. Council, examples of other litigation making the same allegations, and his own arrest.

Moreover, all of the arrests Mr. Alexander describes below "follow[] a common design," that is, they fit the profile of the misapplications of the incommoding statute described by the OPC Report: each involves an MPD officer who, in general, approached African American people who were standing still on the sidewalk in order to warn or cite them for "blocking passage," and to order them to leave the area, regardless of the number of persons on the sidewalk, and regardless of whether they were presenting an obstacle to other pedestrians using the sidewalk. Carter, 795 F.2d at 124.

**Mr. Alexander's arrest on Saturday August 8, 2015.** Mr. Alexander's arrest on Saturday August 8, 2015 was illustrative of how the District enforces the incommoding statute. Am. Compl. ¶¶ 45-57. Mr. Alexander's detailed description of how his arrest illustrates the MPD's custom of enforcing the statute. ¶¶ 45-57, and, like every other "concentrated, fully packed, precisely delineated [arrest] scenario" Mr. Alexander pleaded in his complaint, his own arrest is "proof that an unconstitutional policy or custom [of making such arrests] exists." Page v. Mancuso, 999 F. Supp. 2d 269, 284 (D.D.C. 2013).

Proof that Mr. Alexander's arrest is illustrative of the MPD's custom of enforcing the statute is that his arrest fits the illustrative arrest patterns analyzed in the OPC Report, discussed in detail

below.  The OPC Report states that the OPC received 14 complaints in the period from 2013 to January 2017 regarding MPD officers who, in general, approached people who were standing still on the sidewalk in order to warn or cite them for "blocking passage," and to order them to leave the area, regardless of the number of persons on the sidewalk, and regardless of whether they were presenting an obstacle to other pedestrians using the sidewalk. OPC Report pp. 1-2 (two illustrative complaints); p. 4, n 9 (last complaint received on January 24, 2017).

**Bill Hassay, Jr., a solo musician and homeless people in Georgetown.** In 2011, Bill Hassay, Jr., a solo musician performing at the corner of Wisconsin and M St., NW, was threatened by an MPD police officer with arrest for blocking a sidewalk. The officer told Mr. Hassay that "pedestrians need the full width" of the sidewalk. When the ACLU pointed out to high-ranking officials at MPD Headquarters and Second District that the officer had misinterpreted the law, police said the new law prohibited his being in the same place on the sidewalk. ACLU testimony before Committee on the Judiciary of the Council of the District of Columbia, hearing on Implementation and Effects of Recent Revisions to the Disorderly Conduct Law, February 1, 2012. Available on ACLU website https://www.acludc.org/sites/default/files/docs/Disorderly%20conduct%20oversight%20testimony%20final_0.pdf

**Jeweler case - Occupy protestors - April 11, 12, and 13, 2012.** On April 11, 12, and 13, 2012 MPD officers arrested several (at least eleven) Occupy protestors for "partial blocking" (that is, occupying part of the sidewalk even if no one else wants to use it) a thin strip adjacent to a building façade on a 40 foot wide sidewalk in downtown District of Columbia. The arrests generated litigation and the District moved to dismiss the eleven plaintiffs' false arrest claims on the grounds that the statute allowed arrests for "partial blocking." Amended Complaint [16], ¶¶ 60-67 (12-1843 (RWR/PJF)); District's Motion to dismiss p. 52. The incommoding statute in effect at this time treated protestors

and routine users of the sidewalk and other public spaces under the same section. D.C. Code § 22-1307 *cited in* <u>Duffee v. D.C.</u>, 93 A.3d 1273, 1275.

**Mr. Bugg Bey's arrest and the civil case and opinion.** On about Friday, May 9, 2014 Officer Onoja issued a "move on" order to Mr. Bugg Bey and about eight other friends and neighbors who were simply leaning against a fence in the yard front of 1607 Levis Street, NE, with the permission of the owner in the Trinidad even though no one else was around. Officer Onoja told them all to leave even though none of them were violating the statute. Am. Compl. ¶¶ 126-136. He came back an hour later and arrested Mr. Bugg Bey simply because he had returned to the spot. *Id.* at 131, 136.

**Reporter filming arrest of homeless man; video reviewed by Chief Lanier.** In early September, 2014 two officers told a reporter standing on an extremely broad (approximately 20 feet) sidewalk (where other pedestrians seen in the video using the sidewalk were able to pass without getting any closer than five or 10 feet from the journalist) exercising his First Amendment right to film them making an arrest that he was blocking the passage of the sidewalk and to move on up the street. Am. Compl. ¶¶ 77-83. No one was around, and there was plenty of room of the sidewalk for other people to get by. *Id.*

**The Starburst Plaza dispersal order and arrest.** On about 9/4/2014 the MPD ordered several African American men to leave the Starburst Plaza at 1550 Maryland Ave N.E., Washington, DC 20002 during normal park hours who were doing nothing more than sitting and chatting, and they arrested one of them for violating the incommoding statute because he did not leave when ordered to. Am. Compl. ¶¶ 113-124. The OAG prosecuted him for incommoding in a bench trial but he was acquitted by the Court on a defense motion for judgment of acquittal. *Id.* at 125.

**Arrest and prosecutions of Mr. Agnew, Mr. Dennis, and Ms. Williamson.** Mr. Agnew was arrested on Christmas Eve, 2014 when he and some friends were standing on the stoop of his child's mother's building at 3146 Buena Vista Terrace, SE in Washington, D.C. when no one else was

around because he did not immediately move on when an MPD officer told him to leave because he was blocking passage. Am. Compl. ¶¶ 142-52.[3]

Mr. Dennis was arrested on Thanksgiving Eve, 11/26/2014 when he was standing on a walk in front of his home when no one else was around for at home at 3130 Buena Vista Terrace, SE in Washington, D.C. because he did not immediately move on when an MPD officer told him to leave because he was blocking passage. Am. Compl. ¶¶ 153-167.

Ms. Williamson was arrested on 2/4/2015 when she was standing and walking on the sidewalk on a commercial street at 2403 Martin Luther King, Jr. Ave., S.E. because she did not move on within thirty minutes when an MPD officer told her to leave because, as the police report reads, the officer observed her standing on the street "disrupting the smooth flow of pedestrian traffic" even though way was clear for pedestrians to come and go, and no one was trying to walk on the sidewalk where Ms. Williamson was. Am. Compl. ¶¶ 168-83.

**The City Paper article published on May 22, 2015 quoting activist and former at-large Council candidate Eugene Puryear.** On May 22, 2015, five months before Officer Onoja arrested Mr. Alexander, the City Paper published an article on the "Agnew Plaintiffs" which quoted activist and former at-large Council candidate Eugene Puryear (speaking in March, 2015, several months before Mr. Alexander was arrested) that he both heard about and regularly saw himself in

---

[3] Drawing inferences in Mr. Alexander's favor, although the same officer arrested both Mr. Agnew and Mr. Dennis, and the officer has arrested several other African American young men for alleged violations of the incommoding statute, the fact that their arrests fit the profile of the arrests described in the OPC Report and illustrated by Mr. Alexander's arrest negates any inference that the officer arrested them solely because of any personal racial animus as opposed to the custom of MPD officers who, in general, approached people, especially African American people,  who were standing still on the sidewalk in order to warn or cite them for "blocking passage," and to order them to leave the area, regardless of the number of persons on the sidewalk, and regardless of whether they were presenting an obstacle to other pedestrians using the sidewalk. OPC Report pp. 1-2 (two illustrative complaints); p. 4, n 9 (last complaint received on January 24, 2017). *See* Agnew v. Gov't of the D.C., 263 F. Supp. 3d 89, 95 n.3 (D.D.C. 2017).

Congress Heights near Martin Luther King Jr. Avenue S.E. police telling groups of people standing around to move along for no reason.

**The OPC Report.** The OPC Report states that the OPC received 14 complaints in the period from 2013 to January 2017, and the OPC Report references "numerous" other incidents in addition to the incidents described in the 14 complaints it received. Moreover, although the OPC Report states that the statute became effective in June 2013, it actually became effective via emergency legislation in January 2011, and OPC probably received 8 complaints during the 29 month period between when the statute actually became effective, and June 2013 when the period the OPC studied began.

The OPC Report states that the OPC received 14 complaints in the period from 2013 to January 2017 regarding MPD officers who, in general, approached people who were standing still on the sidewalk in order to warn or cite them for "blocking passage," and to order them to leave the area, regardless of the number of persons on the sidewalk, and regardless of whether they were presenting an obstacle to other pedestrians using the sidewalk. OPC Report pp. 1-2 (two illustrative complaints); p. 4, n 9 (last complaint received on January 24, 2017).

But, a close reading of the OPC Report shows that the Report references many more unconstitutional citations or move on orders than just the 14 incidents in the 14 complaints examined. OPC Report p. 2. For example, the officer who was the subject of the first complaint discussed in the OPC Report stated that he had made "numerous" arrests for "blocking passage" and that "in general, they [presumably MPD officers] approach people who are standing still on the sidewalk in order to warn or cite them for blocking passage, regardless of the number of persons and regardless of whether they are presenting an obstacle to pedestrian traffic." OPC Report p. 2 (discussing OPC Case No. 14-0176, Merits Determination). The officer testified that he had made "numerous" arrests for "blocking passage," and typical online dictionaries define

"numerous" as "indefinitely large numerically, many." Next, the Report stated, "in general, **they** approach people who are standing still on the sidewalk in order to warn or cite them for blocking passage, regardless of the number of persons and regardless of whether they are presenting an obstacle to pedestrian traffic." *Id.* (emphasis added). Drawing inferences in favor of Mr. Alexander, "they" refers to MPD officers in general, not just the officer who was the subject of the complaint. Clatterbrook, 708 F.3d at 557 (courts considering "relevant facts obtained from the public record" in a motion to dismiss must construe the facts in the light most favorable to the plaintiff).

Next, the OPC Report actually undercounts the number of incidents in the relevant period, that is, from enactment of the statute in its current form in 2011 through January 24, 2017, the date of the last complaint analyzed in the OPC Report, because it omits the first two and a half years of the relevant period. The OPC Report states that it analyzes complaints received "[s]ince the passage of the law in [June 19] 2013" through January 24, 2017. OPC Report p. 4, n 9 ("as of January 24, 2017"). Although the OPC Report states that it started its review of "complaints made to OPC since the 2013 passage of the District's Blocking Passage statute," the statute was actually enacted in its current form in 2011, when the Emergency Legislation became effective. 58 D.C. REG. 640 (published January 28, 2011)(attached as Ps. Ex. # ). The 2013 changes became effective June 19, 2013, over six months after the start of 2013. From February 1, 2011 to June June 19, 2013 is 29 and one half months. The 2013 changes did not make any changes to the sections at issue in Mr. Alexander's complaint beyond adding numbers and letters to the text.

Applying "averaging" – basic arithmetic - to the number of complaints made during the three and a half year period June 19, 2013 to January 24, 2017 which are analyzed in the OPC Report means that the OPC probably omits 8 complaints which were probably made during the 29 month

period between January 28, 2011 and the start of the period covered by the OPC Report June 11, 2013 (what OPC believes was the effective date of the statute).

The OPC covers complaints made during the three and a half year period June 19, 2013 to January 24, 2017. Assuming an even distribution of complaints during the 48 month period from 2013 to the end of 2016, a reasonable inference in Mr. Alexander's favor, there was roughly one complaint every 3.5 months. Evidence that a practice existed at one point in time creates a presumption that it existed at another (prior or subsequent). Morgan v. District of Columbia, 824 F.2d 1049, 1063-1064 (D.C. Cir. 1987). So a reasonable inference is that the same number of incidents giving rise to complaints occurred during the 29 month period between January 28, 2011 and the start of the period covered by the OPC Report June 11, 2013 (what OPC believes was the effective date of the statute), so that creates the inference that there were 8 complaints during that period. And by the same logic, the fact that the subject officer made numerous such arrests during the Report period creates the presumption that he made numerous such arrests during the immediately preceding 29 month period which began on January 28, 2011. *Id.*

The OPC report came out May 22, 2017, which is after the MPD arrested Mr. Alexander (on August 8, 2015). Am. Compl. ¶ 23. So, if the MPD policymaker, the Chief, did not learn of the OPC Report until after the date of publication, it did not serve the notice function described in Huthnance v. District of Columbia, 793 F. Supp. 2d 183, 199 (D.D.C. 2011). But, the OPC Report and the applications of the incommoding statute it describes are still "proof that an unconstitutional policy or custom [of making such arrests] exists," Page v. Mancuso, 999 F. Supp. 2d at 284, even if some of them occurred after Mr. Alexander's arrest. Morgan v. District of Columbia, 824 F.2d 1049, 1063-1064 (D.C. Cir. 1987)(evidence that a practice existed at one point creates the presumption of its existence at another time, prior or subsequent). The Hooks arrest described below is also post-event conduct which creates the presumption that the arrest

custom described above remained in force after Mr. Alexander's arrest, and was in effect prior to his arrest. Morgan, 824 F.2d at 1063-1064.

**Hooks arrest 4/24/2017.** In Hooks v. United States officers of the MPD who made a seizure in April 2017 based on what they claimed was a violation of the incommoding statute were described by the District of Columbia Court of Appeals as engaging in "a patently unlawful seizure by officers unaware of the letter of the law they were trying to enforce," where the officers seized a man for "crowding, obstructing, or incommoding" without first issuing a cease "crowding, obstructing, or incommoding" order. Hooks v. United States, 208 A.3d 741, 750 (D.C. 2019).

### 3. District policymakers (D.C. Council and Chief Lanier) on notice of custom

The Baker panel did not expressly state whether the "knowing" in "knowingly ignores" refers to actual or constructive knowledge. The Triplett Court stated that "Jett left open the possibility of liability where final policymakers 'acquiesced in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity,' again without stating whether "acquiesce" required actual or constructive knowledge. Triplett v. District of Columbia, 108 F.3d 1450, 1454 (1997). The purpose of the "knowingly ignores" element is to establish an affirmative link between a custom and the municipality. Id. ("The only acts that count (though they may include inaction giving rise to or endorsing a custom) are ones by a person or persons who have 'final policymaking authority [under] state law.").

A consensus of the Circuits establishes that constructive knowledge as well as actual knowledge is sufficient to attribute a custom to a municipal policy-maker. See Baron v. Suffolk County Sheriff's Dept., 402 F.3d 225, 236-237 (1st Cir. 2005) (municipality is liable if custom is "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." (citation omitted)); Fletcher v. O'Donnell, 867 F.2d 791, 793-94 (3d Cir. 1989)(noting that "custom may be established

by proof of knowledge and acquiescence."); Spell v. McDaniel, 824 F.2d 1380, 1387 (4th Cir. 1987) (noting that "actual knowledge may be evidenced by recorded reports to or discussions by a municipal governing body... [and c]onstructive knowledge may be evidenced by the fact that the practices have been so widespread or flagrant that in the proper exercise of its responsibilities the governing body should have known of them") (citing Bennet v. Slidell, 728 F.2d 762, 768 (5th Cir. 1984) (en banc)); Piotrowski v. City of Houston, 237 F.3d 567, 578 (5th Cir. 2001) ("Actual or constructive knowledge of [a] custom must be attributable to the governing body of the municipality or to an official to whom that body has delegated policy-making authority." (citation omitted)); Thompson v. City of Los Angeles, 885 F.2d 1439, 1444;.

At any rate, Mr. Alexander put on direct evidence that the District policymakers (the Mayor, the D.C. Council, and the Chief of Police) had actual knowledge that the MPD was enforcing the then recently-amended statute so that a single person standing still on the sidewalk was "crowding, obstructing, or incommoding" the "free use" of the sidewalk. Act of May 26, 2011, D.C. Law 18-375, § 2(a) (codified at D.C. Code § 22-1307). Am. Compl. ¶ 81 (then-Chief Lanier personally viewed the videotape of the misapplication of the incommoding statute); Id. at 93 (on February 1, 2012, the D.C. Council, Committee on the Judiciary, held a hearing regarding the 2011 revisions to the disorderly conduct statute and heard testimony from the ACLU on the Hassay incident).

Common methods of establishing that the government was aware of its longstanding problem include: (1) litigation about the claim at issue gives rise to knowledge, (2) D.C. Council hearings, (3) annual oversight reports, (4) CCRB/ OPC reports, and (5) outside consultant reports. Harris, 2019 U.S. Dist. LEXIS 131297, *13; Huthnance, 793 F. Supp. 2d at 199 (CCRB/ OPC reports.

Mr. Alexander pleaded facts about several of these methods in his complaint as detailed below.

Moreover, the large number of instances detailed above establish the plausible claim that how the MPD were unconstitutionally applying the incommoding statute especially to African

Americans was sufficiently longstanding and pervasive enough to itself put the District on notice of the problem. *See* <u>Barnes</u>, 793 F. Supp. 2d at 283 (large numbers of over-detentions shows District deliberately indifferent to over-detentions); <u>Barnes</u>, 242 F.R.D. at 118.

**Warnings in CCE Report attached to Committee Report.** Several agencies warned the D.C. Council before it amended the statute that it could be used as a loitering statute; the majority believed that the prohibition should be limited to blocking, that the current prohibition on "crowding" was too vague; and making the statute too broad would turn it into a "loitering" statute. CCE Report, pp. 6-7, contained in the Committee Report.

On February 1, 2012, the D.C. Council, Committee on the Judiciary, held a hearing regarding the 2011 revisions to the disorderly conduct statute and heard testimony from the ACLU on the **Hassay incident and homeless people in Georgeton which** informed the D.C. Council  that elimination of the "three or more person" congregating element in the previous version of the statute led MPD officers to believe that one person standing still on the sidewalk even if no one else was using the sidewalk was "crowding, obstructing, or incommoding" the sidewalk.

**In early September, 2014 then-Chief Lanier personally viewed the videotape of reporter who was issued a move on order** for blocking the passage when he was simply filming police.[1] Am. Compl. ¶¶ 78, 81-82.

**Bugg Bey's arrest and the civil case and the summary judgment opinion.** Officer Onoja arrested Mr. Bugg Bey on May 9, 2014, the 12-309 notice is date stamped June 6, 2014 and Mr. Bugg-Bey filed his complaint 6/06/2014. Am. Compl. ¶ ¶ 139-141.

**The City Paper published an article on May 22, 2015** profiling Mr. Dennis, Mr. Agnew, and Ms. Williamson and detailing their arrests for incommoding, Am. Compl. ¶ 100, and quoting activist

---

[1]Paragraph 78 of the complaint alleges that the incident occurred in but the video link incorporated in the complaint in ¶ indicates that the incident took place on September 7, 2014.

and former at-large Council candidate Eugene Puryear who says he saw and heard about MPD's ordering African Americans off the sidewalks for no reason. *Id.* at 101.

**The Agnew lawsuit filed on 3/09/15.** The Agnew lawsuit was filed on 3/09/15 and it served on the OAG on 4/1/2015. Both the original complaint [1] and the amended complaint [15] named Chief Cathy Lanier as a party though she was never served. Am. Compl. ¶ 99.

### 4. The policymakers have acquiesced in or knowingly ignored the custom because it still continues at least through May 2017.

The policymakers have acquiesced in or knowingly ignored the MPD's custom of applying the incommoding statute against African Americans as though it were a loitering statute because the custom still continues at least through May 2017. Both the OPC Report published in May 2017 and the <u>Hooks</u> case describing an application of the incommoding statute in April 2017, establish, that even as late as 2017 MPD were still enforcing the incommoding statute by arresting persons (at least African American persons) simply for standing still on or near the sidewalk even when no one else was around or their use of the sidewalk was everyday use that did not impede other people's use of the sidewalk. OPC Report, p. 2; <u>Hooks</u>, 208 A.3d at 749.

Officer Tyson, one of the officers in the <u>Hooks</u>, case under oath in a suppression hearing explained his understanding that "In D.C., you can't block a passage. Passage meaning any walkway that the public has immediate access to because you can't block a walkway because someone ha[s] to walk around you[.]" <u>Hooks</u>, at 744 n.4. In fact, the District of Columbia Court of Appeals described the MPD officers as "officers unaware of the letter of the [incommoding] law they were trying to enforce." *Id.* at 750.

### D. The District failed to "respond to a need . . . in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations."

Mr. Alexander's second alternative theory of municipal liability is the prong 4 <u>Baker</u> theory, "the fact that the government failed to "respond to a need . . . in such a manner as to show

'deliberate indifference' to the risk that not addressing the need will result in constitutional violations." <u>Baker</u>, 326 F.3d at 1306 (citations omitted).

Deliberate indifference is an objective inquiry: courts ask whether the municipality "knew or should have known of the risk of constitutional violations,' but did not act." <u>Harris</u>, 2019 U.S. Dist. LEXIS 131297, *9. Deliberate indifference means that, faced with actual or constructive knowledge that its agents will probably violate constitutional rights, the [municipality] may not adopt a policy of inaction." *Id.* In other words, "Plaintiffs do not have to show that the District subjectively knew about the [enforcement] problem: the question is whether 'the [District] knew or should have known of the risk of constitutional violations, an objective standard.'" <u>Barnes</u>, 793 F. Supp. 2d at 283 (summary judgment) *citing* <u>Baker</u>, 326 F.3d at 1307.

A plaintiff can establish deliberate indifference by several means including by demonstrating: (1) the municipality's failure to train its employees, <u>Page v. Mancuso</u>, 999 F. Supp. 2d 269, 282-83 (D.D.C. 2013); (2) a municipality's failure to respond to repeated complaints about misconduct, *See* <u>Singh v. District of Columbia</u>, 881 F. Supp. 2d 76, 87 (D.D.C. 2012) (finding deliberate indifference where plaintiff reported harassment by a police officer on five separate occasions); <u>Muhammad v. District of Columbia</u>, 584 F. Supp. 2d 134, 139 (D.D.C. 2008) (finding plaintiff stated claim for deliberate indifference where the District failed to take action against a police officer who had been the subject of at least fourteen previous complaints); a municipality's inaction in the face of a longstanding problem such as failing to release inmates from a jail whey they are entitled to release. <u>Harris v. Gov't of the D.C.</u>, 2019 U.S. Dist. LEXIS 131297, *9-10.

Common methods of establishing that the government was aware of its longstanding problem include: (1) litigation about the claim at issue gives rise to knowledge, (2) D.C. Council hearings, (3) annual oversight reports, (4) CCRB/ OPC reports, and (5) outside consultant reports. Harris v. Gov't of the D.C., 2019 U.S. Dist. LEXIS 131297, *13; Huthnance (CCRB/ OPC reports.

Mr. Alexander pleaded facts about several of these methods in his complaint as detailed above. Moreover, the large number of instances detailed above establish the plausible claim that how the MPD were unconstitutionally applying the incommoding statute especially to African Americans was sufficiently longstanding and pervasive enough to itself put the District on notice of the problem. *See* Barnes, 793 F. Supp. 2d at 283 (large numbers of over-detentions shows District deliberately indifferent to over-detentions); Barnes, 242 F.R.D. at 118.

And yet, as the OPC Report published in May 2017 and the Hooks case describing an application of the incommoding statute in April 2017 establish, even as late as 2017 MPD were still enforcing the incommoding statute by arresting persons (at least African American persons) simply for standing still on or near the sidewalk even when no one else was around or their use of the sidewalk was everyday use that did not impede other people's use of the sidewalk. OPC Report, p. 2; Hooks, 208 A.3d at 749.

### E. Mr. Alexander also Established the District's Liability on Claim 1 Based on the District's adoption of Officer Onoja's Custom of Unconstitutional Conduct.

Mr. Alexander establishes the same predicate constitutional violation on this claim because for the reasons stated above Officer Onoja's arrest of Mr. Alexander Custom lacked probable cause. In addition to the "bad acts" of Officer Onoja establishing a custom of illegal conduct Mr. Alexander pleaded in his Amended Complaint he also incorporated by reference the incidents listed on the SMFs [statements of material fact] set forth in plaintiff's statements of material fact in [Fontroy] v. District of Columbia, et al., 1:16-cv-01741-TFH. [17-2] in which Officer Onoja was a named defendant. They include:[5]

> ➤ Officer Onoja's own personnel file reflects at least five documented instances where Officer Onoja initiated a citizen stop to enforce a "quality of life" and escalated these

---

[5] The incident in SMF ¶ 1 actually happened in September 2, after Mr. Alexander's arrest.

offenses into a use of force incidents resulting in injury to citizens, p. 1, introductory paragraph;

➢ Officer Onoja attempted to arrest a Mr. Carter for not revealing the contents of his white Styrofoam cup, and Mr. Carter requested a supervising officer (or "white shirt") to the scene, and told the "white shirt about the incident, SMF # 2;

➢ In or about April of 2015, Officer Onoja falsely arrested Mr. Hall for unlawful entry and threw him up against the police car for no reason, SMF # 13-16;

➢ In fact during 2015 Officer Onoja stalked Mr. Hall by following him down the street and harassed Mr. Hall in more than ten separate encounters, for example, calling out things to make people in the neighborhood think he was a snitch, SMF # 16-17.

Without more, these incidents including the five written complaints in Officer Onoja's own personnel file to create the inference that the Chief the MPD department knew, or should have known, of Officer Onoja's unconstitutional conduct in integrating with and arresting citizens who were doing nothing wrong. *See* Beck v. City of Pittsburgh, 89 F.3d 966, 973 (3d Cir. 1996).

### III. Claim 2: The Incommoding Statute Is Vague under the Second Prong of the Vagueness Doctrine, the Arbitrary and Discriminatory Enforcement Prong, as Applied.

The incommoding statute is vague under the second prong of the vagueness doctrine, the arbitrary and discriminatory enforcement prong, as applied, *Id.* ¶¶ -245. United States v. Barnes, 2019 U.S. Dist. LEXIS 184603, *1 (D.D.C. 2019). A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement. Hill v. Colorado, 530 U.S. 703, 732, 120 S. Ct. 2480, 2498 (2000). In Kolender, for the first time, the Supreme Court elevated the second prong into an independent ground for invalidation, not just an additional reason for invalidation. Kolender v. Lawson, 461 U.S. 352, 361 (1983).

As explained above, Mr. Alexander's arrest for incommoding was made pursuant to the MPD's custom of MPD officers who, in general, approached people, especially African American people,  who were standing still on the sidewalk in order to warn or cite them for "blocking passage," and to order them to leave the area, regardless of the number of persons on the

sidewalk, and regardless of whether they were presenting an obstacle to other pedestrians using the

sidewalk, and to arrest them if they refused to leave or stay away. OPC Report pp. 1-2 (two

illustrative complaints).

In order words, the MPD apply the statute to African Americans as though it were a loitering

statute. *See* Ricks, 414 F.2d at 1103-04(construing the undefined term "loitering" in the District's

narcotics vagrancy statute by reference to statutes from other jurisdictions forbidding anyone "to

lounge or loiter about any street or street corner" or to "habitually loaf, loiter, and/or idle upon any

public street or highway or in any public place"); Lytle, 326 F.3d at 469 ("loitering" has "by long

usage acquired a common and accepted meaning" which is "to stand idly about," quoting Webster's

II New College Dictionary 645 (1999)).

Absent some special safety considerations a loitering statute as applied to people like Mr.

Alexander is unconstitutionally vague as applied under the Fifth Amendment under the second

prong of the vagueness doctrine, the arbitrary and discriminatory enforcement prong because "it

leaves speculative the tests for ascertaining the line separating guilty from innocent acts." Ricks, 414

F.2d at 1101. *See also* Desertrain v. City of L.A., 754 F.3d 1147, 1149 (9th Cir. 2014). In

Desertrain the plaintiffs challenged on vagueness grounds an L.A. ordinance which prohibited use

of a vehicle "as living quarters either overnight, day-by-day, or otherwise."[5] 754 F.3d at 1149. The

Desertrain Court held that the record plainly showed that some of the conduct plaintiffs were

engaged in when arrested — eating, talking on the phone, or escaping the rain in their vehicles —

"mimics the everyday conduct of many Los Angeles residents," 754 F.3d at 1157, yet "appears to

be applied only to the homeless." 754 F.3d at 1156 (comparing LA ordinance to the Chicago

"loitering plus" statute invalidated by the Court in Morales).

---

[5] Desertrain invalidated the LA ordinance on both prongs of the vagueness doctrine, facially
and as applied. Desertrain v. City of L.A., 754 F.3d 1147, 1149 (9th Cir. 2014).

Furthermore, "allegations that the anti-obstructing statute is being enforced in a racially discriminatory, harassing manner ... [can] bolster an as-applied challenge." Agnew, 920 F.3d at 60.

## IV.   Claim 3: The Incommoding Statute Is Vague Facially and as Applied Under the First Prong of the Vagueness Doctrine, the Lack of Fair Notice Prong.

The incommoding statute is vague facially and as applied under the first prong of the vagueness doctrine, the lack of fair notice prong, Claim 3, *Id.* at ¶¶ 246-252. The first prong of the vagueness doctrine, the lack of fair notice prong, "prohibits the Government from taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes." Agnew v. Gov't of the D.C., 263 F. Supp. 3d 89, 95-96 (D.D.C. 2017).

As explained above, Mr. Alexander's arrest for incommoding was made pursuant to the MPD's custom of applying the incommoding statute to African Americans as though it were a loitering statute. *See* Lytle, 326 F.3d at 469 ("loitering" has "by long usage acquired a common and accepted meaning" which is "to stand idly about," quoting Webster's II New College Dictionary 645 (1999)). Absent some special safety considerations a loitering statute as applied to people like Mr. Alexander is unconstitutionally vague as applied under the Fifth Amendment under the first prong of the vagueness doctrine, the lack of fair notice prong. Ricks, 414 F.2d at 1101(loitering statute vague because "it leaves speculative the tests for ascertaining the line separating guilty from innocent acts")(invalidating loitering statute on both prongs of the vagueness doctrine); Lytle, 326 F.3d at 468-69(invalidating loitering statute under the first prong of the vagueness doctrine, the lack of fair notice prong.

### 1.   Mr. Alexander has standing to seek declaratory and injunctive relief.

Mr. Alexander has been arrested pursuant to the statute and he has plausibly alleged that the District has a custom of enforcing the statute against people – especially African Americans – for standing still on the sidewalk when no one else is around or when their use of the sidewalk does

not impede the free use of the sidewalk by others. Mr. Alexander faces a credible threat of arrest. A plaintiff need not, however, await an arrest or prosecution to have standing to challenge the constitutionality of a criminal statute. Martin v. City of Boise, 920 F.3d 584, 609 (9th Cir. 2019). Moreover, Mr. Alexander does have standing to seek expungement of his arrest record and a declaration that his arrest was a legal nullity. Hedgepeth v. Wash. Metro. Area Transit Auth., 386 F.3d 1148, 1152 (2004). Plaintiffs' claim for nominal damages, Paragraph D in "Class Relief Demands" of Amended Complaint, provides a sufficiently concrete interest in the outcome of the litigation to confer standing to pursue declaratory relief. *See* Yniguez v. Arizona, 975 F.2d 646, 647 (9th Cir. 1992).

### 2. *Mr. Alexander alleged facts supporting his claim that unconstitutional statute states a predicate constitutional violation.*

Mr. Alexander has two primary theories of liability. If, as he contends, the statute is facially unconstitutional then, like the policy at issue in Monell, the statute is an unconstitutional policy of the District, and by proving it unconstitutional he proves causation, that is, the unconstitutional statute was the moving force behind his arrest. Similarly, if, as Mr. Alexander contends, the statute is unconstitutional as applied to him, and the custom of enforcement is itself unconstitutional, then, again, by the custom proving unconstitutional, he proves causation, that is, the unconstitutional statute was the moving force behind his arrest. Finally, if Mr. Alexander proves that the statute is unconstitutional as applied to him and the District then the statute is still the moving force behind his arrest.

The two cases the District cites, Reyes v. City of Lynchburg, 300 F.3d 449, 456-57 (4th Cir. 2002) (plaintiffs sought damages for defending a criminal prosecution based on an ordinance violation until the municipal court found the ordinance unconstitutional and dismissed the ordinance violation proceeding) and Richardson v. South Euclid, 904 F.2d 1050, 1053 (6th Cir.

1990)(plaintiff sought nominal damages after being acquitted in a prosecution based on a violation of an ordinance that was subsequently repealed and then found unconstitutional as applied to the plaintiff), are poorly reasoned out of Circuit cases that fly in the face of Supreme Court precedent because they put the burden of poorly drafted unconstitutional laws on the community rather than on the municipality that enacts them, which inverts the burden allocation scheme established by the Court in <u>Owen</u> for municipalities. <u>Owen v. Independence</u>, 445 U.S. 622, 651-52 (1980)(in accordance with Section 1983 principles the municipality should err on the side of caution in enforcing laws, and if there has been a constitutional deprivation as a result of a municipal policy, even where government officials have acted in good faith, the injured plaintiffs should not bear the brunt of the resulting loss). Holding the District liable for Officer Onoja's arrest of Mr. Alexander caused by the District's unconstitutional statute or custom serves the Congressional policies behind § 1983 claims against a municipality of encouraging municipalities to know the law and to err on the side of caution in protecting the whom it governs from the likelihood of unintentional infringements on constitutional rights. <u>Owen</u>, 445 U.S. at 651-52.

For some reason the District tries to palm these two cases off as "causation" cases but they are really cases holding that the plaintiffs did not state predicate constitutional violations. For example, the <u>Richardson</u> Court treated the plaintiffs' claim as for damages for being prosecuted under a statute the trial court found unconstitutional as a procedural due process claim, and it held that in receiving a trial the plaintiffs had got all the process they were entitled to, so there was no predicate constitutional violation. <u>Richardson</u>, 904 F.2d at 1053. Regardless of the validity of this rationale, it is inapposite to Mr. Alexander's claim because he seeks damages for his arrest and detention, not for his prosecution (he was not prosecuted), and so he got no process and he does not bring a procedural due process claim. His claim is based on another component of the Due Process Clause.

Moreover, the Richardsons sued not only the City but also "certain City officials," and the panel's rationale that recognizing a claim when "City officials" fail to correctly evaluate a law's constitutionally before prosecuting community members who violate it would subject "state law enforcement officials" to damages, 904 F.2d at 1055, is a qualified immunity principle not a principle of municipal liability, and qualified immunity does not protect municipalities, even when the law changes and they fail to predict the change. Owen, 445 U.S. at 651-52.

It is unclear why the Richardson panel analogized a prosecution under an unconstitutional statute conducted by prosecutors trained in the law to a sheriff's taking three days at the holiday season to investigate a claim of mistaken identity in a "wrong warrant" case is a legal curiosity the District did not explain. *See* Connick, 563 U.S. at 64 (unlike law enforcement officers, prosecutors are trained in the law and equipped with the tools to interpret and apply legal principles, understand constitutional limits, and exercise legal judgment). A better analysis is the analysis of this Court in Lederman which held that the District was liable when its prosecutor prosecuted a community member under a statute that turned out to be unconstitutional under the First Amendment because "Public prosecutors ... are professionally obligated to screen cases according to various criteria, not the least of which is legal soundness." Lederman v. United States, 2007 U.S. Dist. LEXIS 27521, *13 (D.D.C. 2007) *motion for reconsideration on other grounds granted* Lederman v. United States, 539 F. Supp. 2d 1 (D.D.C. 2008).

The District raises similar arguments in footnote 4 where it argues Mr. Alexander's Claims 2 and 3 fail to state claims for relief under Section 1983 because a "Fifth Amendment false arrest claim" is an inapposite cause of action because, the District seems to argue, the Fourth Amendment is the only Constitutional Amendment which grants a remedy for injuries caused by a municipality's unconstitutional statute or custom. Memorandum [24-1], p. 17, n. 4. Enforcing an unconstitutional statute (whether facially or as applied pursuant to a custom) against a person gives

Page 40

rise to a claim under § 1983 regardless of the Constitutional provision violated. 42 U.S.C.A. 1983. The plain language of the statute provides a remedy for "the deprivation of *any* rights, privileges, or immunities secured by the Constitution and laws" without excluding any Constitutional right. *Id.* Moreover, a remedy lies for damages caused by an arrest and detention pursuant to an unconstitutional statute or custom regardless of what Constitutional right enforcement of the statute or custom violates. Lozman v. City of Riviera Beach, 138 S. Ct. 1945, 1955 (2018)(plaintiff states a claim for damages under § 1983 against a municipality caused by his arrest by policymakers which violated his First Amendment rights regardless of whether the arresting officer had probable cause to make the arrest); Grossman v. City of Portland, 33 F.3d 1200, 1203 (9th Cir. 1994)(protestor arrested pursuant to statute that turned out to be unconstitutional under the First Amendment entitled to damages for his arrest); Hedgepeth v. Washington Metropolitan Area Transit Auth., 386 F. 3d 1148, 1156 (D.C. Cir. 2004)( "simply because a practice passes muster under the Fourth Amendment (arrest based on probable cause does not mean that unequal treatment with respect to that [same] practice is consistent with equal protection."). As the Grossman Court explained in a case for damages caused by an arrest brought under the First Amendment, the constitutional claim does not stem from an absence of probable cause to arrest, but from the alleged unconstitutionality of the ordinance justifying the arrest. Grossman, 33 F.3d at 1203-04. At least one Circuit has recognized a claim for damages under § 1983 caused by an arrest pursuant to a statute that was vague under the Fourteenth Amendment, the States analogue of the federal Fifth Amendment applicable to the District. Fields v. City of Omaha, 810 F.2d 830 (8th Cir. 1987)(Eight Circuit held that Omaha loitering and prowling ordinance was unconstitutionally vague on its face under the Due Process Clause; Court also held that both the municipality and the arresting officer were liable in compensatory damages and the officer might also be liable for punitive damages for enforcing the statute against Ms. Fields by arresting and causing her prosecution). Moreover, the Supreme

Court has rejected District's argument that the applicability of one constitutional amendment to a defendant's conduct pre-empts the guarantees of another. Soldal v. Cook County, 506 U.S. 56, 70 (1992)(expressly rejecting argument that Graham requires a court, when it finds that a wrong implicates more than one constitutional command, to look at the dominant character of the challenged conduct to determine under which constitutional standard it should be evaluated, but instead holding that each constitutional provision must be examined in turn). ("Certain wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands. Id.; Hedgepeth, 386 F. 3d at 1156 ( "[S]imply because a practice passes muster under the Fourth Amendment (arrest based on probable cause) does not mean that unequal treatment with respect to that practice is consistent with Equal Protection."). The case the District cites is distinguishable because it is a claim against the arresting officer, Matthews v. District of Columbia, 730 F. Supp. 2d 33, 36-37 (D.D.C. 2010), and it is wrong because it relies on a reading of Graham that the Superior Court has rejected, Soldal v. Cook County, 506 U.S. at 70 (the same set of facts can give rise to more than one Constitutional claim).

   Defendant's argument that Mr. Alexander did not violate the statute is baffling. The statute did not give the arresting officer fair notice that arresting Mr. Alexander for standing on the sidewalk is the same as arresting him for loitering; Mr. Alexander did not violate the statute but nonetheless Officer Onoja enforced it against him pursuant to a District policy (if facially vague) or a District custom (if vague as applied) and "there's the rub." Alternatively, even if Mr. Alexander did violate the statute as Officer Onoja applied it to him pursuant to the MPD's custom of using it as a loitering statute, he did not violate the statute as enacted. Moreover, the rule the District relies on – "a plaintiff must show that the law in question is impermissibly vague in all of its applications to succeed on a facial challenge" has been overruled by the Superior Court in Johnson as the case the District cites acknowledges. See Crooks v. Mabus, 845 F.3d 412, 417 (2016) citing Johnson v.

United States, 135 S. Ct. 2551, 2556-62 (2015) for the proposition that "finding penal statutory provision was void for vagueness although it would be permissible as applied to some conduct." The statute is vague facially or as applied for the reasons stated above.

### F.  Claim IV: Mr. Alexander's Amended Complaint Plausibly Pleaded an Equal Protection Claim.

Mr. Alexander's Amended Complaint plausibly pleaded an Equal Protection Claim, Am. Compl. ¶¶ 253-55, based on his allegations that the MPD officers have a custom of selectively enforcing the incommoding statute as a loitering statute against African Americans. *See* OPC Report, p. 4 (of the 9 complainants who identified their race, "seven involved African American complainants, one involved another minority complainant, and one involved a Caucasian complainant); other examples *supra*. Although the OPC Report covered complaints received during the period from mid-June 2013, to January 2013, drawing inferences in favor of Mr. Alexander, there is no reason to think that the distribution of the complaints based on race is different during the period before Mr. Alexander's arrest, especially since the other persons listed in the complaint are African Americans.[7]

That means 77% of the incommoding complaints the OPC received were filed by African Americans, but African Americans account for only 46.4% of the D.C. population, and 88% of the incommoding complaints were filed by African Americans and other minorities, even though African Americans and other minorities account for only 54.4% of the population. United States Census Bureau https://www.census.gov/quickfacts/DC .  A comparison figure is that according to data supplied by the MPD, D.C. is 47% African American, but African Americans make up 70%

---

[7] Neither Mr. Alexander nor his counsel know whether Bill Hassay and the homeless people described in the ACLU written testimony were African American. But, "[a]llowing defendants to escape liability for discriminating against Hispanics [or African Americans] simply because they occasionally mistreat white motorists would dismantle our equal protection jurisprudence." Chavez v. Ill. State Police, 251 F.3d 612, 637 (7th Cir. 2001).

of all police stops. WAMU report based on MPD data https://wamu.org/story/19/09/10/d-c-police-release-long-delayed-stop-and-frisk-data-showing-racial-disparities-in-stops/ Similarly, in year 2017 78% of complaints filed with the OPC were from African American complainants and only 13% were filed by White/ Hispanic/ Other complainants. Office of Police Complaints, 2017 Annual Report, p. 15.

https://policecomplaints.dc.gov/sites/default/files/dc/sites/office%20of%20police%20complaints/publication/attachments/OfficeofPoliceComplaints_AR17.pdf

The focus in claims of racially selective law enforcement is on the difference in treatment between similarly situated African Americans and the Caucasian race. *See e.g.*, United States v. Armstrong, 517 U.S. 456, 463-66 (1996); Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d 1157, 1166 (10th Cir. 2003). The plaintiff must demonstrate that the defendant's actions had a discriminatory effect and were motivated by a discriminatory purpose. *Id.* at 1168 *citing* Armstrong, 517 U.S. at 465 *and cases involving traffic stops challenged on equal protection grounds* Chavez v. Ill. State Police, 251 F.3d 612, 635-36 (7th Cir. 2001); Farm Labor Org. Comm. v. Ohio State Highway Patrol, 308 F.3d 523, 533-36 (6th Cir. 2002). Because direct evidence of police motivation is usually unavailable Plaintiffs usually rely on circumstantial evidence such as statistical comparisons between the number of black or other minority Americans stopped or arrested and their percentage in some measure of the relevant population. Marshall, 345 F.3d at 1168. This requires a reliable measure of the demographics of the relevant population, a means of telling whether the data represent similarly situated individuals, and a point of comparison to the actual incidence of crime among different racial or ethnic segments of the population. *Id.*

Some courts have used geographic areas such as the same stretch of highway in determining "similarly situated." Chavez, 251 F.3d at 637 (same stretch of I-80 at the same time). African

Americans appear to be singled out in all areas of the District and Caucasians seem to escape arrest for the same type of conduct in all areas so similarly situated appears to be people on the District's sidewalks. The pictures of Mr. Alexander show Caucasians as well as African Americans and there is no evidence that Officer Onoja ever arrested a Caucasian for anything, let alone incommoding. Moreover, the Court can take judicial notice that many people go to Georgetown and yet the picture shows Caucasian people blocking the entire sidewalk and none of them were ordered to cease blocking, leave, or were arrested.

Alleging that the District's enforcement of § 22-1307(a) in neighborhoods with rising property values supports the allegation that the District enforces virtually always against African Americans because the neighborhoods are undergoing gentrification and MPD officers like Officer Onoja are using the statute to push out African Americans so Whites can move in. Compl. ¶¶ 107-09. Cf. District's Memorandum at 28.

## CONCLUSION

Respectfully submitted,

/s/William Claiborne
William Claiborne
DC Bar # 446579
717 D Street, Ave., NW
Ste 300
Washington, DC 20004-2815
Phone: (202) 824-0700
Email: claibornelaw@gmail.co