# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ) | |
| JOSEPH ALEXANDER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 17-1885 (ABJ) |
| ) | |
| GOVERNMENT OF ) | |
| THE DISTRICT OF COLUMBIA, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM OPINION

Plaintiff Joseph Alexander is an African American man who was arrested in August of 2015 for violating a District of Columbia law that makes it unlawful for a person "[t]o crowd, obstruct, or incommode . . . [t]he use of any street, avenue, alley, road, highway, or sidewalk." D.C. Code § 22-1307.  He has filed a lawsuit against the District alleging that he was falsely arrested in violation of the Fourth Amendment, and he has included claims on behalf of a proposed class of individuals charged with the same offense alleging that the law is unconstitutionally vague and that it is being enforced by the police in a discriminatory manner in violation of the Fifth Amendment.  *See* Am. Compl. [Dkt. # 21].

On August 23, 2019, defendant moved to dismiss plaintiff's amended complaint, arguing that he had failed to state a claim upon which relief could be granted.  Def.'s Mot. to Dismiss [Dkt. # 24] ("Def.'s Mot."); Def.'s Mem. of P. & A. in Supp. of Def.'s Mot. [Dkt. # 24-1] ("Def.'s Mem.").  Plaintiff opposed the motion.  Pl.'s Opp. to Def.'s Mot. [Dkt. # 29] ("Pl.'s Opp.").  For the reasons stated below, defendant's motion will be granted in part and denied in part.  Plaintiff's claims about the deficiencies of the statute merely repackage arguments that have already been

rejected by this Court and the D.C. Circuit, and Claims 2 and 3 will be dismissed. To the extent that plaintiff seeks to predicate municipal liability for an allegedly unconstitutional arrest on a vicarious liability theory or a failure to supervise the arresting officer, his claims will be dismissed. But if one resolves all inferences in favor of the plaintiff, as one is required to do at this stage, the claim of false arrest in Claim 1 must go forward, and plaintiff has alleged sufficient facts in support of Claim 4 to survive a motion to dismiss his claim that the District is liable based on its failure to act in response to a pattern of unconstitutional arrests that have become a matter of custom. The Court expresses no view as to whether plaintiff will ultimately be able to succeed on these claims, but it would be premature to dispose of them at this time.

## BACKGROUND

### I.   Factual Background

On Saturday, August 8, 2015, at about 5:30 pm, plaintiff was standing in an alley that intersects with Benning Road in Northeast, Washington, D.C. Am. Compl. ¶¶ 25, 27. The alley comes to an end at a wide sidewalk where a popular convenience store and pay phone were located. *Id.* ¶¶ 27–33. Plaintiff states that he moved from the alley to the "intersection of the alley and the sidewalk" when Officer Frederick Onoja, a member of the D.C. Metropolitan Police Department, arrived on the scene. *Id.* ¶ 35. The complaint alleges that plaintiff was not blocking passage or presenting an obstacle to pedestrian traffic on the sidewalk; others were able to walk past him, including a woman walking two dogs. *Id.* ¶ 37. Officer Onoja approached plaintiff and told him to leave the area. *Id.* ¶ 38. Plaintiff alleges that "he did leave the area but over the next five minutes, [he] walked up and down the sidewalk a few times." *Id.* ¶ 39. Officer Onoja called for backup and soon, three officers arrived. *Id.* ¶ 40. They all stood by the alley while plaintiff came back down the sidewalk towards them. *Id.* When plaintiff passed Officer Onoja, the officer

grabbed him from behind, and the other officers converged on plaintiff and handcuffed him. *Id.* ¶¶ 41–43.  Plaintiff was arrested for a violation of D.C. Code § 22-1307, and transported to the Fifth District Police Station, where he was approved for release on citation. *Id.* ¶¶ 44–45.  The D.C. Office of the Attorney General then "no-papered" – or declined to prosecute – the case. *Id.* ¶ 46.

D.C. Code § 22-1307 states:  "[i]t is unlawful for a person, alone or in concert with others . . . [t]o crowd, obstruct, or incommode . . .  [t]he use of any street, avenue, alley, road, highway, or sidewalk[.]"  D.C. Code § 22-1307(a) (the "incommoding statute").  Plaintiff contends that he was not in violation of the statute because he was not crowding, obstructing, or incommoding anyone's passage through the sidewalk.  Am. Compl. ¶ 49.  He also alleges that the statute is "employed especially against young African American men in the community most frequently near areas such as the Trinidad area."  *Id*. ¶ 104; *see also id*. ¶ 196.  Plaintiff names other neighborhoods where the law has been heavily enforced, *id.* ¶¶ 115–27, and he details several other instances in which African American individuals were arrested for a violation of the incommoding statute.  *Id.* ¶¶ 128–85.

The complaint goes into some detail about the history of the provision, which is one of several disorderly conduct provisions in the District, and circumstances that allegedly brought flaws in its enforcement to the District's attention.  In 2010, the Council for Court Excellence ("CCE"), with other groups such as the American Civil Liberties Union ("ACLU"), the Office of the Attorney General ("OAG"), the District of Columbia U.S. Attorney's Office ("USAO"), and the District of Columbia Metropolitan Police Department ("MPD"), issued a report regarding the disorderly conduct statute, *see* D.C. Code § 22-1307, which included "incommoding" at that time.  Am. Compl. ¶¶ 66–67.  According to the complaint, the report recounted concerns expressed about

the vagueness of the law, and the CCE's suggestion that the word "blocking" be substituted for "obstructing," "crowding," or "incommoding." *Id.* ¶ 68. The OAG, USAO, and MPD disagreed, although they proposed that a *mens rea* requirement be added to the statute as well as a requirement that an officer issue a "stop blocking" order before making an arrest. *Id.* ¶ 71. Despite the concerns raised in the CCE report, the D.C. Council enacted the statute as it reads now, without "blocking" language, a *mens rea* requirement, or a "stop blocking" order requirement. *Id.* ¶¶ 76–77.

In 2011, a journalist was videotaping police officers on a sidewalk in Northwest D.C., and the police officers ordered him to leave, stating that he was blocking the sidewalk. Am. Compl. ¶¶ 80, 81. The sidewalk was approximately twenty feet in width. *Id.* ¶ 83. The incident gained widespread attention because, as plaintiff puts it, it was evident that ordering the journalist to move was "pretext to get him to stop videotaping" the police officers. *Id.* ¶ 81. The event led to an investigation into the issue of whether the statute was being enforced in an arbitrary or discriminatory manner. *Id.* ¶¶ 87–89. Plaintiff alleges that during that investigation, D.C. Council Member Mary Cheh wrote a letter to the Council stating that the MPD was enforcing the law arbitrarily. *Id.* ¶ 89. Plaintiff alleges that the D.C. Council did not take any steps to amend the statute or address the issue of arbitrary enforcement. *Id.* ¶ 91.

On February 1, 2012, the D.C. Council Committee on the Judiciary held a hearing on the investigation and heard testimony from the ACLU. Am. Compl. ¶ 95. At the hearing, the MPD Director of Strategic Change testified that the Department had developed "a written directive explaining the law and an online training session that could be delivered to all members of the MPD. *Id.* ¶ 97. All members were required to certify that they had reviewed the directive and taken and passed the online training." *Id.* Plaintiff contends that "neither the written directive nor the online training session addressed the issue of whether partial blocking was sufficient to justify

an arrest." *Id.* ¶ 98.  The D.C. Council recognized that additional training may be necessary, *id.* ¶ 99, but none was instituted.  *Id.* ¶ 216.

Plaintiff also alleges that the MPD has received numerous complaints regarding the enforcement of the incommoding statute.  From 2013 to 2017, the Police Complaints Board ("PCB"), which is the governing body of the Office of Police Complaints ("OPC"), received fourteen complaints alleging that officers had improperly issued "move along" orders or made unlawful arrests for violations of the incommoding statute.  *Id.* ¶ 187.  In a report submitted on May 22, 2017 to D.C. Mayor Muriel Bowser, the PCB noted that a majority of individuals who filed complaints were African American.  According to plaintiff, "[t]he PCB is concerned that MPD officers['] use of the Blocking Passage statute is disproportionately discriminating against these specific groups of people."  *Id.* ¶¶ 189–90.  Plaintiff alleges that the District has not taken any steps to remediate the issues identified in this report.  *See id.* ¶¶ 214–17.

## II.   Procedural Background & the *Agnew* Litigation

On June 26, 2017, the Court issued its decision in *Agnew v. District of Columbia*, 263 F. Supp. 3d 89 (D.D.C. 2017).  In that case, plaintiffs Daryl Thomas Agnew, Rashad Bugg Bey, Alex Dennis, and Rayneka Williamson filed a complaint against the District of Columbia alleging that their constitutional rights had been violated when they were arrested and prosecuted pursuant to the incommoding statute.  *Id.* at 91–92.  They challenged the statute on its face on the grounds that it was unconstitutionally vague; the lawsuit centered around the allegation that the provision violated the Fifth Amendment because it encouraged arbitrary and discriminatory enforcement. The Court found that the statute was not unconstitutionally vague, and because plaintiffs had failed to state a predicate constitutional violation, their 42 U.S.C. § 1983 claim failed as well.  The

plaintiffs appealed the decision on July 25, 2017. *See* Notice of Appeal [Dkt. # 44], *Agnew v. District of Columbia*, Civ. A. No. 15-0340 (D.D.C. July 25, 2017).

While the *Agnew* appeal was pending, plaintiff filed this case against the District of Columbia and Officer Onoja,[1] Compl. [Dkt. # 1], including the following claims:

> Claim 1:  False arrest in violation of the Fourth Amendment, Compl. ¶¶ 209–12;
>
> Claim 2:  Arbitrary and discriminatory enforcement of the incommoding statute, resulting in unlawful arrests, in violation of the Fifth Amendment, Compl. ¶¶ 213–20;
>
> Claim 3:  Lack of fair notice, resulting in unlawful arrests, in violation of the Fifth Amendment, Compl. ¶¶ 221–27; and
>
> Claim 4:  Unlawful prosecutions, in violation of the Fourth and Fifth Amendment, Compl. ¶¶ 228–31.

On December 1, 2017, the Court ordered plaintiff to state his position on whether the case should be stayed pending the appeal of *Agnew v. District of Columbia*, Civ. A. No. 15-0340, "given the fact that Claim 2 alleges . . . that the incommoding statute is vague under the second prong of the vagueness doctrine, the arbitrary and discriminatory enforcement prong, because the statute authorizes and even encourages arbitrary and discriminatory enforcement and that is the very issue ruled on in *Agnew*, a case filed on behalf of the same putative class."  Min. Order (Dec. 1, 2017). After the parties briefed the issue, the Court issued a stay "[g]iven the substantial overlap between the factual allegations and the legal contentions in the instant complaint and the issues to be resolved in the appeal of the *Agnew* case."  Min. Order (Feb. 14, 2018).

On April 5, 2019, the D.C. Circuit issued its decision in *Agnew v. District of Columbia*, 920 F.3d 49 (D.C. Cir. 2019).  It affirmed the Court's ruling, finding that "it is readily apparent that the terms 'to crowd, obstruct, or incommode' the use of public ways mean to block or hinder

---

1   On December 25, 2017, plaintiff voluntarily dismissed defendant Onoja from the case. Notice [Dkt. # 11].

other people's ability to pass through or use a common space," and that therefore, "the anti-obstructing statute is not unconstitutionally vague on its face."  *Id.* at 56.

After the Court of Appeals issued its ruling, the Court ordered the parties to file submissions addressing the impact of the *Agnew* decision on this case.  Min. Order (Apr. 9, 2019). Plaintiff notified the Court that the decision barred his facial challenge to the incommoding statute based upon the arbitrary and discriminatory enforcement prong of the vagueness doctrine.  Notice [Dkt. # 18].  The Court ordered plaintiff to file an amended complaint eliminating those allegations. Min. Order (May 16, 2019).

Plaintiff's compliance with that directive was spotty.  He filed what he entitled an amended complaint, but the first three claims under 42 U.S.C. §1983 remained unchanged.  *Compare* Compl. ¶¶ 209–27, *with* Am. Compl. ¶¶ 235–54.  The fourth claim was amended to state a violation of the equal protection clause of the Fifth Amendment.  Am. Compl. ¶¶ 255–57.

Defendant filed a motion to dismiss on August 23, 2019, arguing that plaintiff has failed to put forward sufficient facts to allege a constitutional violation or to give rise to municipal liability for any constitutional violation under section 1983.  Def.'s Mem.

## STANDARD OF REVIEW

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In *Iqbal*, the Supreme Court reiterated the two principles underlying its decision in *Twombly*:  "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Iqbal*, 556 U.S. at 678.  And "[s]econd, only a complaint that states a

plausible claim for relief survives a motion to dismiss." *Id*. at 679, citing *Twombly*, 550 U.S. at 556.

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *id*., quoting *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

In evaluating a motion to dismiss under Rule 12(b)(6), a court must "treat the complaint's factual allegations as true and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal citation omitted), quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979); *see also Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011), quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005). Therefore, when considering a motion to dismiss, a court must construe a complaint liberally in the plaintiff's favor. *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

Nevertheless, the court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the court accept plaintiff's legal conclusions. *Id.*; *see also Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In ruling upon a motion to dismiss for failure to state a claim, a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*,

226 F. Supp. 2d 191, 196 (D.D.C. 2002), citing *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 (D.C. Cir. 1997).

**ANALYSIS**

Plaintiff brings four claims alleging violations of 42 U.S.C. § 1983 against the District of Columbia.  The statute creates a cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom or usage . . . subjects . . . any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."   42 U.S.C. § 1983; *see Pitt v. District of Columbia*, 491 F.3d 494, 510 (D.C. Cir. 2007).  The term "person" in section 1983 includes municipalities, such as the District of Columbia, but a municipality cannot be held liable under section 1983 "*solely* because it employs a tortfeasor—in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  To maintain a section 1983 action against the District of Columbia, the Court must first "determine whether the complaint states a claim for a predicate constitutional violation," and "then the court must determine whether the complaint states a claim that a custom or policy of the municipality caused the violation."  *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003), citing *City of Canton v. Harris*, 489 U.S. 378, 389 (1989).

In assessing the first prong, the Court addresses whether plaintiff has stated a claim for a constitutional violation.  "In order to establish this predicate violation, neither District of Columbia policy makers nor employees need be implicated. All that is being established at this stage is that there is some constitutional harm suffered by the plaintiff, not whether the municipality is liable for that harm." *Baker*, 326 F.3d at 1306–07.

Under the second prong, the Court must go on to determine whether the "complaint states a claim that a policy or custom of the District of Columbia caused the constitutional violation alleged under the first prong." *Id.*, citing *Monell*, 436 U.S. at 694.  "The court must determine

9

whether the plaintiff has alleged an 'affirmative link,' such that a municipal policy was the 'moving force' behind the constitutional violation." *Id.* (internal citations omitted).

There are several ways in which a plaintiff may successfully allege the existence of the necessary municipal policy or custom:

> Specifically, []he may point to (1) "the explicit setting of a policy by the government that violates the Constitution," (2) "the action of a policy maker within the government," (3) "the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become 'custom,'" or (4) "the failure of the government to respond to a need (for example, training of employees) in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations."

*Blue v. District of Columbia*, 811 F.3d 14, 18–19 (D.C. Cir. 2015), quoting *Baker*, 326 F.3d at 1306.

### I. The Court will not dismiss Claim 1 because the amended complaint sufficiently alleges a constitutional violation and that the District of Columbia was the cause of that violation.

In Claim 1, plaintiff alleges that Officer Onoja violated his Fourth Amendment rights because he was not blocking the sidewalk when he was apprehended, and that the District of Columbia is liable for the unlawful action because it has a policy and practice "of encouraging and acquiescing" in its officers' use of the statute to "clear the sidewalks of young African American men by arresting them for incommoding without probable cause." Am. Compl. ¶¶ 236, 237. In addition, plaintiff alleges the District is liable for the unconstitutional arrest "because the District and its policymakers and the MPD knew or should have known that [Officer] Onoja had a history of making illegal arrests . . . and the District acquiesced in his conduct by failing to discipline him." *Id.* ¶ 238.

Defendant argues first that the claim should be dismissed because plaintiff has failed to allege sufficient facts to establish that Officer Onoja acted without probable cause, and so the

complaint lacks the required constitutional violation.  Def.'s Mem. at 8–9.  Defendant also argues that has plaintiff has failed to identify a district policy that caused his arrest.  *Id.* at 10.

The Court finds that plaintiff has sufficiently alleged that his constitutional rights were violated.  To state a claim for false arrest under the Fourth Amendment, a plaintiff must allege that he "was arrested against his will and that the arrest was unlawful."  *McCarthy v. Kleindienst*, 741 F.2d 1406, 1413 (D.C. Cir. 1984).  An arrest is unlawful if it was conducted without probable cause, and "'[g]enerally, probable cause exists where the facts and circumstances within the arresting officer's knowledge, of which he had reasonably trustworthy information, are sufficient in themselves to warrant a reasonable belief that an offense has been or is being committed.'"  *Amobi v. D.C. Dep't of Corr.*, 755 F.3d 980, 990 (D.C. Cir. 2014), quoting *Rucker v. United States*, 455 A.2d 889, 891 (D.C. 1983).

Here, plaintiff has sufficiently alleged that the officer lacked probable cause when he made the arrest.  He explicitly states that at the time he was apprehended, he was walking on the sidewalk, and not "crowding," "incommoding," or "obstructing" it.  Am. Compl. ¶¶ 40, 41.  He also states that he was not blocking passage or posing any obstacle to pedestrian traffic.  *Id.* ¶ 37.  He maintains that the sidewalk is wide enough for people to stop and talk with each other and still leave room for other people to walk by.  *Id.* ¶ 29.  Resolving all inferences in plaintiff's favor, these facts, taken together, are sufficient to give rise to a plausible claim of a constitutional violation.

According to the District, plaintiff admitted he was violating the statute because he stated in the amended complaint that he was "standing at the intersection" and the photographs in the complaint show that he was standing in the sidewalk, and thus, "Officer Onoja could have reasonably determined that he was 'crowd[ing], obstruct[ing], or incommod[ing] . . . [a] sidewalk."

Def.'s Mem. at 9–10.   But merely standing on a public sidewalk is not the same as crowding, obstructing, or incommoding.   *See Agnew*, 920 F.3d at 58 ("The statute does not apply to minor inconveniences or merely subjective annoyance, but only to observed obstacles or blockages."). In addition, plaintiff alleges that when he was arrested, he was not *standing* on the sidewalk:   he was walking on it, and that is not prohibited by the statute.   Am. Compl. ¶¶ 40–41.   Thus, the claim will not be dismissed for lack of an alleged predicate constitutional violation.

To sue the District, though, plaintiff must also allege that a custom or policy of the municipality was the moving force behind the constitutional violation. This requires the plaintiff to plead "the elements of the relevant type of municipal policy" and "indicate[ ] the contours" of the policy.   *Blue*, 811 F.3d at 20.   Plaintiff alleges three bases for municipal liability:   (1) "a policymaker knowingly ignored a practice that was consistent enough to create a custom," (2) "the District failed to respond to a need . . . in such a manner as to show deliberate indifference to the risk that not addressing the need will result in constitutional violations"; and (3) the District knowingly ignored Officer Onoja's practice of arresting people without probable cause.  Pl.'s Opp. at 5–7; *see* Am. Compl. ¶¶ 237–38.

A plaintiff sufficiently pleads a section 1983 custom or policy claim when the complaint refers to specific incidents that plausibly show a custom or pattern of behavior.  *See Warren v. District of Columbia*, 353 F.3d 36, 40 (D.C. Cir. 2004) (finding that the allegation that a prison official "stuck the same needles in everybody's arms to draw blood" was sufficient to allege a custom or policy of prisoner mistreatment); *see also Singh v. District of Columbia*, 881 F. Supp. 2d 76, 87 (D.D.C. 2012) (where the plaintiff was issued three traffic tickets over the span of eighteen days, and he reported the harassment on five separate occasions, he stated a claim for a section 1983 custom or policy claim); *Trimble v. District of Columbia*, 779 F. Supp. 2d 54, 59

(D.D.C. 2011) ("[M]erely speculating that an unidentified policy and uncorroborated practice or custom exists without providing any factual heft to support the allegation is insufficient to state a claim under section 1983.")

Here, the amended complaint – if taken as true on its face – contains sufficient information to give rise to a plausible inference that numerous similar false arrests under this statute have been brought to the District's attention, and that there is a custom or pattern of behavior that can be attributed to the District. Thus, the complaint has sufficiently alleged municipal liability under the third prong of the *Baker* test: "the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become 'custom.'" *Baker*, 811 F.3d at 1306.

Plaintiff alleges that a number of individuals have been falsely arrested pursuant to this statute, including Bugg Bey, Agnew, Dennis, and Williamson. Am. Compl. ¶¶ 128–85. But that is not the sole basis for his claim. He also alleges that the District has long been aware of the issues associated with enforcing the statute. The complaint states that in 2011, the D.C. Council recognized that the incommoding statute was being invoked even when the person's conduct "did not interfere with other pedestrians' free passage on the sidewalk," Am. Compl. ¶ 87, and the D.C. Council held hearings on the issue. *Id.* ¶ 88. But, the District did not take any action to address the issues at the time. *Id.* ¶ 91. The complaint also alleges that the District of Columbia Police Complaints Board ("PCB") issued a report on May 22, 2017, stating that fourteen complaints between the period of 2013 to 2017 alleged that officers had inappropriately issued "move on" orders or arrested individuals under the incommoding statute. Am. Compl. ¶¶ 186–87. The PCB allegedly reported that during the investigation of one complaint, a police officer testified that he approaches "people who are standing still on the sidewalk in order to warn them or cite them for

blocking passage, . . . regardless of whether they are presenting an obstacle to pedestrian traffic."
*Id.* ¶ 193. Several of the complaints, plaintiff contends, "have led to sustained allegations against
MPD officers" and there are "complaints currently under investigation." *Id.* ¶ 188.

Assuming the truth of these allegations and drawing all inferences in favor of plaintiff, as
the Court is required to do at this stage, the Court finds that these actions support a plausible
inference that the District of Columbia caused plaintiff's unconstitutional arrest by adopting as
policy, through its inaction, a known customary practice of making questionable arrests under the
incommoding provision. Thus, plaintiff has stated a claim under section 1983 under the third
*Baker* prong, and Claim 1 will move forward.

Plaintiff also alleges that the District is liable for his arrest under the fourth *Baker* prong:
that the District failed to respond to a need, such as training, in such a manner as to show deliberate
indifference to the risk that not addressing the need will result in constitutional violations. *Baker*,
326 F.3d at 1306. He alleges that the District was aware that the statute was being enforced
unconstitutionally, and it was aware that its officers needed additional training, but that it failed to
take any steps to improve the training program. Am. Compl. ¶¶ 8, 78, 94, 96, 97–99, 216–17.
Plaintiff also alleges that the District failed to respond to Officer Onoja's practice of arresting
people without probable cause. *Id.* ¶¶ 219–34.

The Supreme Court has recognized that a municipality's failure to train its officers can
form the basis of a section 1983 claim against it, but "only where the failure to train amounts to
deliberate indifference to the rights of persons with whom the police come into contact." *City of
Canton*, 489 U.S. at 388. In some circumstances, "the need for more or different training is so
obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the
policymakers of the city can reasonably be said to have been deliberately indifferent to the need."

*Id.* at 390.  Thus, a municipality may be deemed deliberately indifferent when "city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, . . . [and] policymakers choose to retain that program." *Connick v. Thompson*, 563 U.S. 51, 61 (2011), citing *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997); *see Baker*, 326 F.3d at 1307 ("Deliberate indifference is determined by analyzing whether the municipality knew or should have known of the risk of constitutional violations, an objective standard.").  A municipality can likewise be liable for inadequately supervising its employees if it was deliberately indifferent to an obvious need for greater supervision.  *See, e.g.*, *Colbert v. District of Columbia*, 5 F. Supp. 3d 44, 60 (D.D.C. 2013).

But "[d]eliberate indifference is a stringent standard of fault . . . ."  *Connick*, 563 U.S. at 61, quoting *Brown*, 520 U.S. at 410 (internal quotation marks omitted).  "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."  *Id.* at 62, quoting *Brown*, 520 U.S. at 409. In other words, the determination is necessarily fact based.

Here, there is significant overlap in the allegations supporting municipal liability under the third and fourth *Baker* prongs.  As stated above, plaintiff points to a number of circumstances in which individuals were either falsely arrested or improperly threatened with arrest under the incommoding statute by various MPD officers.  Am. Compl. ¶¶ 138, 153, 167, 185 (detailing incidents in which Officers Norris, Onoja, and Amos conducted false arrests); *id.* ¶¶ 79–85 (where a journalist attempted to record an encounter between a homeless man and the police, Officers Reynolds and Akhtar ordered the journalist to leave the area and improperly threatened to arrest him for incommoding).  He also details events that later became the subject of police complaints, in which officers were found to be using the statute improperly.  *Id.* ¶¶ 192, 195 (alleging that the

Office of Police Complaints investigated two complaints and found that the "officer[s] improperly harassed the complainant"). Finally, plaintiff alleges that at least two police officers are known to misuse the statute. *Id.* ¶ 148 ("Officer Norris is known to have arrested several other young African American men in the area for incommoding who were not incommoding or blocking the way."); *id.* ¶ 219 ("Defendant Onoja is an open and notorious violator of civil rights of the people in the District of Columbia whom he polices.").

Furthermore, plaintiff alleges that the District knew that officers were misusing the law and that there were likely deficiencies in its training program on the law for police officers, but it did not take any action. For example, after the report from the CCE came out in 2011 and the D.C. Council held hearings about possibly amending the law, the Council heard testimony detailing incidents in which police officers issued "move along" orders to individuals who were not incommoding or blocking passage, thereby showing that the District was aware of the need to further train officers on when the law could be invoked. *Id.* ¶ 75. Plaintiff also alleges that because various groups had recommended changing the text of the law, the District was on notice that the "statute had the potential to be abused, and that its administration should be carefully monitored and officers needed training and constant reinforcement training." *Id.* ¶ 78. Furthermore, in 2012, the D.C. Council held hearings on the improper use of this statute, and one of the councilmembers "suggested that training may be . . . important," and that "an intensive refresher training may be needed" even though some online trainings had already been instituted. *Id*. ¶¶ 95–100. After this hearing, the District did not "provide updated training or written directives," nor did it "provide roll call training or other training on how the statute applies when no other people are around." *Id.* ¶¶ 216–17.

While the allegations in the complaint are somewhat conclusory, and they will need to be proven in the next stage of litigation, it would be inappropriate for the Court to cut off the inquiry before it begins.  The allegations taken together state a claim for a pattern of similar constitutional violations such that the city was deliberately indifferent to a need, in particular, a deficiency in its training program.  In light of that, and given the Court's finding that Claim 1 was going forward anyway, and the fact that discovery on the two theories will be largely the same, the Court finds that the claim for municipal liability under *Baker*'s fourth prong should go forward as well.

## II.    The Claim 2 challenge to the statute under the discriminatory enforcement prong of the void for vagueness doctrine must be dismissed in accordance with the D.C. Circuit's binding opinion in *Agnew*.

In Claim 2, plaintiff alleges that the incommoding statute is unconstitutional because it authorizes and encourages arbitrary and discriminatory enforcement.  Am. Compl. ¶ 242.  This type of challenge invokes the "void-for-vagueness" doctrine, which arises under the right to due process guaranteed by the Fifth Amendment.  *United States v. Bronstein*, 849 F.3d 1101, 1106 (D.C. Cir. 2017).

> The Due Process Clause protects individuals from laws that are so vague that they cannot be understood with reasonable consistency—whether by the people who must obey the law or the officials charged with applying it. A law may be unconstitutionally vague either because it "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits," or because it "authorize[s] and even encourage[s] arbitrary and discriminatory enforcement," or both.

*Agnew*, 920 F.3d at 55, quoting *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999).

In *Agnew*, the plaintiff challenged the provision at issue here under the second prong of the doctrine.  The Court of Appeals held that the incommoding statute was not unconstitutionally vague on its face "[b]ecause it is readily apparent that the terms 'to crowd, obstruct, or incommode' the use of public ways mean to block or hinder other people's ability to pass through or use a

17

common space." *Id.* at 56.  The Court found that the text of the statute clearly did "not punish conduct that has no effect on other members of the public; it is violated only by actual or imminent obstruction of another person[,]" and that if the statute is "read with a dose of common sense, [it] confirms that a violation occurs only when a person effectively appropriates more than his fair share of a public area or walk, in conflict with the prerogatives of other people also seeking to use that space." *Id.* at 58.  While the Court recognized that "[t]he facts of the plaintiffs' arrests as they allege them are troubling," the plaintiffs had not brought a claim of racially discriminatory prosecution, and "identified instances of a statute's misapplication do not tell us whether the law is unconstitutional in every application." *Id.* at 60.

The *Agnew* case expressly challenged the statute on its face.  *Id.* at 51.  But here, plaintiff Alexander, represented by the same lawyer, has characterized his claim in Claim 2 as an "as-applied" challenge.  Am. Compl. ¶ 242.  A facial challenge seeks a ruling that a law is unconstitutional in all of its applications.  *United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.").  "An ordinary as-applied challenge, by contrast, asks a court to assess a statute's constitutionality with respect to the particular set of facts before it."  *Hodge v. Talkin*, 799 F.3d 1145, 1156 (D.C. Cir. 2015).  The distinction between the two challenges "goes to the breadth of the remedy employed by the Court."  *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010).

It is important to note, though, that "[t]he substantive rule of law is the same for both challenges."  *Edwards v. District of Columbia*, 755 F.3d 996, 1001 (D.C. Cir. 2014), citing *Legal Aid Servs. of Or. v. Legal Servs. Corp.*, 608 F.3d 1084, 1096 (9th Cir. 2010).  While rejection of a

facial challenge does not "necessarily preclude the possibility of a successful as-applied challenge . . . 'a plaintiff cannot successfully bring an as-applied challenge to a statutory provision based on the same factual and legal arguments the . . . Court expressly considered when rejecting a facial challenge to that provision.  Doing so is not so much an as-applied challenge as it is an argument for overruling a precedent.'"  *Republican Party of Louisiana v. Fed. Election Comm'n*, 219 F. Supp. 3d 86, 95–96 (D.D.C. 2016), *aff'd sub nom. Republican Party of Louisiana v. Fed. Election Comm'n*, 137 S. Ct. 2178 (2017), quoting *Republican Nat'l Comm. v. Fed. Election Comm'n*, 698 F. Supp. 2d 150, 157 (D.D.C. 2010), *aff'd*, 561 U.S. 1040 (2010).

Here, plaintiff has failed to amend his complaint so that it would do anything other than recapitulate the *Agnew* allegations. He alleges that the statute's vagueness "authorizes and even encourages arbitrary and discriminatory enforcement," *see, e.g.*, Am. Compl. ¶¶ 242–43, and he argues in opposition to the motion to dismiss that the law is unconstitutional "as-applied to people like [him]" because "it leaves speculative the tests for ascertaining the line separating guilty from innocent acts." Pl.'s Opp. at 36, quoting *Ricks v. District of Columbia*, 414 F.2d 1097, 1101 (D.C. Cir. 1968).  This is exactly why the plaintiffs in *Agnew* claimed the provision was unconstitutional on its face.  920 F.3d at 51.  The Court in *Agnew* firmly rejected that argument, finding that meaning of the statute was apparent from its text.  *Id.* at 56.

Plaintiff also argues that the statute is unlawfully applied to "African Americans as though it were a loitering statute."  Pl.'s Opp. at 36.  But in *Agnew*, the plaintiffs similarly argued that the law was being enforced in a racially discriminatory and harassing manner, and the Court pointed out that this was not relevant to a vagueness challenge.  920 F.3d at 60 (noting that plaintiffs had not brought a claim for discriminatory prosecution), citing *United States v. Armstrong*, 517 U.S. 456, 463–66 (1996).

Since Claim 2 is based upon the same factual and legal arguments that were made in *Agnew*, it is precluded by *Agnew*, and the Court will grant defendant's motion to dismiss the claim.

## III.   The Claim 3 due process challenge to the statute on the grounds that it is too vague to put the public on notice must also be dismissed in light of *Agnew*.

Plaintiff also alleges that the statute is unduly vague under the first prong of the void-for-vagueness doctrine because it does not give "fair notice" of the prohibited conduct.  Am. Compl. ¶ 249.  Claim 3 asserts both a facial and an as-applied challenge on this basis.  *Id.* ¶ 249.  Defendant argues that the facial challenge must be dismissed because plaintiff lacks standing to bring it. Def.'s Mem. at 21–23.  It also argues that plaintiff has failed to state a claim for a Fifth Amendment violation: it submits that he has not alleged sufficient facts to show that the constitutional infirmity caused his arrest, and that the *Agnew* decision precludes this claim as well.  *Id*. at 21–26.

### A.  Standing

"To state a case or controversy under Article III, a plaintiff must establish standing."  *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 133 (2011); *accord Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (holding that "standing is an essential and unchanging part of the case-or-controversy requirement of Article III").  Standing is a "necessary 'predicate to any exercise'" of federal jurisdiction; if it is lacking, the dispute is not a proper case or controversy under Article III, and federal courts have no subject matter jurisdiction to decide the case. *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1361 (D.C. Cir. 2012), quoting *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996).

To establish constitutional standing, plaintiff must demonstrate: (1) that he has suffered a concrete, particularized, and actual or imminent "injury in fact"; (2) that the injury is "fairly . . . trace[able]" to the challenged action of the defendant; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*,

504 U.S. at 560–61, quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 27 (1976) (internal quotation marks omitted).   "The party invoking federal jurisdiction bears the burden of establishing" standing.  *Id.* at 561.  "[A] plaintiff must demonstrate standing separately for each form of relief sought."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000), citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983) (notwithstanding the fact that plaintiff had standing to pursue damages, he lacked standing to pursue injunctive relief); *see also Lewis v. Casey*, 518 U.S. 343, 358, n. 6 (1996) ("[S]tanding is not dispensed in gross.").

Where a plaintiff "seeks prospective declaratory and injunctive relief, he must establish an ongoing or future injury that is 'certainly impending'; he may not rest on past injury."  *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015), quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013).   Defendant argues that because plaintiff's facial challenge seeks "prospective declaratory and injunctive relief," including a declaratory judgment that the incommoding statute is unconstitutional and an injunction prohibiting its enforcement, plaintiff "must establish ongoing or future injury that is 'certainly impending' and cannot rest on past injuries."  Def.'s Mem. at 22, quoting *Williams v. Lew*, 819 F.3d 466, 472 (D.C. Cir. 2016).

But plaintiff does allege a current and ongoing injury.  In his complaint, he states that he is seeking an injunction "in the form of sealing . . . arrest records for incommoding" and a declaration that "the arrests [are] a nullity."  Am. Compl. at 47–48; *see* Pl.'s Opp. at 38 (arguing that he has standing to seek expungement of his arrest record).  Plaintiff's ongoing injury, therefore, is his current arrest record.  The D.C. Circuit has recognized that the consequences of a criminal record is a cognizable legal injury, *see Menard v. Saxbe*, 498 F.2d 1017, 1023 (D.C. Cir. 1974) ("Although [plaintiff] cannot point with mathematical certainty to the exact consequences of his criminal file,

we think it clear that he has alleged a 'cognizable legal injury.'"), and that the sealing of an arrest

record is an "appropriate remedy in the wake of police action in violation of constitutional rights."

*Sullivan v. Murphy*, 478 F.2d 938, 968 (D.C. Cir. 1973) ("The principle is well established that a

court may order the expungement of records, including arrest records, when that remedy is

necessary and appropriate in order to preserve basic legal rights.").   Furthermore, the Court of

Appeals has held "that unlawful maintenance of records of arrest results in 'injuries and dangers'

that are 'plain enough' and that 'this threat is not dissipated, or rendered insubstantial or illusory,

by the fact that the arrest was not followed by a prosecution.'"   *Menard*, 498 F.2d at 1023, quoting

*Sullivan*, 478 F.2d at 962.

Thus, plaintiff has standing to challenge the law on its face, and the Court may go on to

address the merits of the claim.

## B.  Failure to State a Claim

 "The void-for-vagueness doctrine, as [the Supreme Court] ha[s] called it, guarantees that

ordinary people have 'fair notice'" of the conduct a statute proscribes.  *Sessions v. Dimaya*, 138 S.

Ct. 1204, 1212 (2018), quoting *Papachristou v. Jacksonville*, 405 U.S. 156, 162 (1972).   To

provide "fair notice," "[g]enerally, a legislature need do nothing more than enact and publish the

law, and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to

comply." *Texaco, Inc. v. Short*, 454 U.S. 516, 532 (1982).

The D.C. Circuit has elaborated further on what "fair notice" entails:

> [A] statutory term is not rendered unconstitutionally vague because it do[es]
> not mean the same thing to all people, all the time, everywhere.  When
> interpreting a statutory term, we are not concerned with vagueness in the
> sense that the term requires a person to conform his conduct to an imprecise
> but comprehensible normative standard, whose satisfaction may vary
> depending upon whom you ask.   Rather, a statute is unconstitutionally
> vague if, applying the rules for interpreting legal texts, its meaning
> specifie[s] no standard of conduct . . . at all.

*Bronstein*, 849 F.3d at 1107–08 (internal citations and quotation marks omitted).

Plaintiff alleges that "[t]he ordinance is not clear and it does not provide fair notice as to what conduct is deemed likely to cause a crowding, obstructing, or incommoding problem."  Am. Compl. ¶ 250.  He also contends that it also does not "place reasonable individuals on notice as to whether they must merely 'cease crowding, obstructing, or incommoding' or whether they must leave the area, and if so, how far must they go, and how long must they stay."  *Id.* ¶ 251.

While the plaintiffs in the *Agnew* case did not bring a "lack of fair notice" void-for-vagueness claim, the D.C. Circuit's opinion dispensed with the arguments that plaintiff makes here.  The Court examined the use of the word "incommode" together with "crowd" and "obstruct" and found that "the three words read together in context are plainly concerned with impediment or hindrance."  920 F.3d at 57.  It found that "the statute is not impermissibly vague just because the term incommode 'may not roll off the average person's tongue today,' and does 'not mean the same thing to all people, all the time.'"  *Id.* at 57, citing *Bronstein*, 849 F.3d at 1107–08, and quoting *Roth v. United States*, 354 U.S. 476, 491 (1957).  It went on to state that "[t]he statutory text, read with a dose of common sense, confirms that a violation occurs only when a person effectively appropriates more than his fair share of a public area or walk, in conflict with the prerogatives of other people also seeking to use that space, *id.* at 58, and the law "does not apply to minor inconveniences or merely subjective annoyance, but only observed obstacles or blockages."  *Id.*  Finally, the Court also held that "'how far' and 'how long' are self-defining under the statute:  Individuals need not vacate the public space altogether, they must simply stop blocking the use of the way or place at issue.  Because the statute vests no banishment power in police, it can suffer no defect on that account."  *Id.* at 60.

In other words, this Court is bound by Circuit precedent to find that the statute is not impermissibly vague as to the kind of conduct it prohibits, and it places individuals on notice as to how to cease violating the law.  Thus, Claim 3 will be dismissed.

**IV.     The Court will not dismiss Claim 4 because the amended complaint sufficiently alleges a constitutional violation and that the District of Columbia was the cause of that violation.**

In Claim 4, plaintiff asserts a violation of the Equal Protection Clause, alleging that the District is liable "for intentionally enforcing the statute in a racially discriminatory manner by making arrests and issuing citations under the statute and issuing move on orders under the statute virtually exclusively against African Americans."  Am. Compl. ¶ 256.

The Equal Protection Clause, which applies to the District of Columbia via the Fifth Amendment, *see Bolling v. Sharpe*, 347 U.S. 497, 499 (1954) (applying Fourteenth Amendment's Equal Protection Clause to D.C. through Fifth Amendment's Due Process Clause); *see also Dixon v. District of Columbia*, 666 F.3d 1337, 1339 (D.C. Cir. 2011), requires state actors to treat similarly situated persons alike.  *See City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).  The clause protects against intentional and arbitrary discrimination, "whether by express terms of a statute or by its improper execution through duly constituted agents."  *Sunday Lake Iron Co. v. Twp. of Wakefield*, 247 U.S. 350, 352 (1918).

To succeed on an equal protection claim, plaintiff must show that "[he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (citations omitted). The Supreme Court has "made clear that proof of [ ] discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."  *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 194 (2003) (internal quotation marks and citation omitted);

*Snowden v. Hughes*, 321 U.S. 1, 8 (1944) ("The unlawful administration by [government] officers of a [law] fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is . . . a denial of equal protection [only if] there is shown to be present in it an element of intentional or purposeful discrimination.").

Applying those precedents, defendant argues that the claim must be dismissed because plaintiff "does not allege facts showing *he* was treated differently, or that those who are treated differently, if any exist, are similarly-situated to him." Def.'s Mem. at 28.  At this stage, the Court must treat all the allegations in the complaint as true and draw all inferences in favor of the plaintiff. *Sparrow*, 216 F.3d at 1113.  And, taken together, plaintiff's allegations support a plausible inference that as an African American man, Am. Compl. ¶ 48, plaintiff was treated differently than individuals of other races using the District's sidewalks in a similar manner. *See, e.g.*, *id.* ¶¶ 22, 47, 104.  He alleges that Caucasian or Asian individuals engage in the same conduct, but no Caucasian or Asian individuals get arrested for it. *Id.* ¶¶ 23, 198.  For example, the complaint includes a photograph of mostly Caucasian individuals waiting in a long line on the narrow sidewalks circling a renowned bakery in Georgetown.  According to plaintiff, no one is arrested for standing outside of this Caucasian-owned store. *Id.* ¶ 198.

Plaintiff alleges that "[a]fter years of investigation, the only Caucasian person the MPD has issued a move on order to under the incommoding statute was the photojournalist who tried to record an MPD interaction with a homeless man." Am. Compl. ¶ 197.  And, the PCB report issued in May of 2017 detailed fourteen complaints received between 2013 and 2017 regarding improper use of the incommoding statute. *Id.* ¶¶ 186–87.  In particular, the organization "noticed that a majority of the individuals who filed a complaint with the agency belong[ed] to a specific racial group (African Americans)," *id.* ¶ 189, and that it was "concerned that MPD officers use of

the . . . statute is disproportionately discriminating against these specific groups of people." *Id.* ¶ 190.

Plaintiff also alleges that African Americans are intentionally targeted by the Metropolitan police.  Am. Compl. ¶¶ 104, 105, 110.  He claims that an MPD detective has acknowledged the heavy police presence in a predominantly black neighborhood, and the fact that the officers do not "discriminate between the bad and the good people."  *Id.* ¶¶ 108–12.  Plaintiff alleges that the detective stated that he believes that "undesirables congregate" in this neighborhood, and that the police "take a zero[-]tolerance approach to quality of life crimes because they depress property values."  *Id.* ¶¶ 110–11.  Plaintiff alleges that the MPD uses the incommoding statute to clear the streets "of the traditionally African American residents."  *Id.* ¶ 105.

These factual allegations, taken together, state a claim for a violation of the Equal Protection Clause that is plausible on its face.  *See Iqbal*, 556 U.S. at 678; *see Grissom v. District of Columbia*, 853 F. Supp. 2d 118, 126 (D.D.C. 2012); *Cf. Atherton v. District of Columbia Office of Mayor*, 567 F.3d 672, 688 (D.C. Cir. 2009) (dismissing equal protection claim based on race discrimination in jury service when a juror was excused because he had alleged only that he was half Mexican and that he had openly thanked a witness in Spanish).

The Court must now consider whether plaintiff has sufficiently alleged that the District of Columbia was the "moving force" behind the constitutional violation.  *See Baker*, 326 F.3d at 1306.  Defendant argues that plaintiff's allegations regarding the existence of a policy, Am. Compl. ¶¶ 2, 20, 45, 194, 198, fall short because they are conclusory, and in any event, "plaintiff also fails to tie any policy or custom to his arrest such that it was the moving force."  Def.'s Mem. at 28.

Plaintiff states that he relies on two theories for municipal liability:  (1) "a policymaker knowingly ignored a practice that was consistent enough to create a custom," and/or (2) "the

26

District failed to respond to a need . . . in such a manner as to show deliberate indifference to the risk that not addressing the need will result in constitutional violations."  Pl.'s Opp. at 5 (citation omitted).

The report issued in May of 2017 by the PCB supports plaintiff's claim for municipal liability.  *See* Am. Compl. ¶ 186.  As detailed above, the report conveyed the PCB's concern that the statute was being disproportionately used on African Americans.  *Id.* ¶ 189.  Plaintiff further alleges that the District has not intervened in response to the problem, and it has not undertaken an analysis of the arrest narratives or provided updated training or written directives. *Id.* ¶¶ 214–17.  These allegations are sufficient to support a claim for municipal liability.  *See, e.g.*, *Byrd v. Dist. of Columbia*, 297 F. Supp. 2d 136, 139 (D.D.C. 2003) (stating deliberate indifference is "determined objectively, by analyzing whether the municipality knew or should have known of the risk of . . . violations, and yet failed to respond as necessary") (citations omitted)

And, plaintiff has alleged multiple instances where African Americans were inappropriately arrested under the statute, and he alleges that African Americans are disproportionately arrested under this statute, Am. Compl. ¶ 197, even though there are Caucasian and Asian individuals who engage in similar conduct.  *See id.* ¶ 198.  These allegations, taken together, are sufficient to show a pattern of behavior that is consistent enough to become a custom. *See M.J. v. District of Columbia*, 401 F. Supp. 3d 1, 15 (D.D.C. 2019) (finding that plaintiffs have stated a section 1983 municipal liability claim where the complaint identified numerous occasions of constitutional violations).

Accordingly, plaintiff has stated a claim for municipal liability under section 1983, and the Court will deny defendant's motion to dismiss on this issue. The Court cautions, though, that

plaintiff has a long way to go to prove these claims, and that he will need to back up his largely

conclusory allegations with facts to survive a motion for summary judgment at a later date.

## CONCLUSION

For the foregoing reasons, the Court will grant defendant's motion to dismiss in part and

dismiss Claims 2 and 3, and it will deny it in part with respect to Claims 1 and 4.

A separate order will issue.


AMY BERMAN JACKSON
United States District Judge

DATE:  July 1, 2020